*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0017p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHAEL W. BENGE,

    *Petitioner-Appellant,*

  *v.*             No. 05-3122

DAVID JOHNSON, Warden,

    *Respondent-Appellee.*

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 98-00861—Edmund A. Sargus, Jr., District Judge.

Argued: June 1, 2006

Decided and Filed: January 16, 2007

Before: MARTIN, GILMAN, and ROGERS, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Randall L. Porter, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Randall L. Porter, Kyle E. Timken, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

  GILMAN, J., delivered the opinion of the court, in which ROGERS, J., joined. MARTIN, J. (pp. 13-19), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

  RONALD LEE GILMAN, Circuit Judge. Michael W. Benge was convicted of aggravated murder and aggravated robbery in violation of Ohio law and was sentenced to death. He filed a petition for habeas corpus that raised sixteen alleged errors in the state-court proceedings. The district court denied the petition, but granted a Certificate of Appealability (COA) as to seven of Benge's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

# I. BACKGROUND

## A.      Factual background

The Ohio Supreme Court set forth the following facts and procedural history of this case in *State v. Benge*, 661 N.E.2d 1019, 1022-24 (Ohio 1996):

In the early morning hours of February 1, 1993, a car belonging to Judith Gabbard, defendant-appellant Michael W. Benge's live-in girlfriend, was found abandoned on the west side of the Miami River in Hamilton, Ohio. The vehicle was found near the river with the front passenger-side tire stuck in a gully. After the vehicle was towed to the impound lot, the tow-truck operator observed blood on the front bumper and passenger side of the car and notified the police.

The police returned to the area where the car was found and discovered the body of Judith Gabbard in the Miami River. Her body had been weighed down with a thirty-five pound piece of concrete which had been placed upon her head and chest. One of the pockets on the jacket Gabbard was wearing was empty and turned inside out. She still had in her possession her checkbook, cash and jewelry. The police retrieved a tire iron, or lug wrench, from the river approximately twelve to fifteen feet from where Gabbard's body was found. A jack and spare tire were found in Gabbard's trunk, but no lug wrench was discovered. Police removed lug nuts from the vehicle, which were sent to a laboratory and compared with the lug wrench. Although no positive match was made, the lug nuts did bear markings which were similar to the lug wrench.

The police gathered other physical evidence from the scene which was also tested by a forensic laboratory. Strands of hair and type A blood (which both Gabbard and appellant had) were found on the driver's side front tire. Smears of blood were also discovered above the passenger-side headlight and on the fender. Police also found a pool of blood with a tire track through it and blood contained in the tire treads. According to one of the investigative detectives, this evidence indicated that the car had been driven through the blood and through the hair of the victim.

An autopsy was performed, which revealed that the victim had suffered a number of blows to the head with a long blunt object which produced pattern abrasions and multiple skull fractures, one of which was circular in nature. According to the coroner, the victim died of brain injuries secondary to multiple skull fractures which were inflicted with a blunt object.

The police apprehended Benge the next day, on February 2, 1993. When the detectives approached Benge, on the street, they observed him drop Judith Gabbard's ATM card to the ground. They picked up the card, arrested Benge, and took him into the station for questioning. After being read his Miranda warnings, Benge agreed to talk to the detectives. Benge told police that two black men in a Bronco had chased him and Gabbard to the river and that their car had gotten stuck. Benge claimed that one of the men injured Gabbard and took her ATM card while the other held him at gunpoint, demanding the ATM code word. When Benge refused to tell him, the man returned the ATM card to him. Benge escaped by jumping into the river. As he swam away, he heard Gabbard screaming as the men beat her. The detectives told Benge they did not believe his story. Benge told them he thought he should talk to a lawyer. The questioning ceased at that point.

A short time later, Benge told police he was willing to talk. Benge signed a Miranda warning card indicating that he waived his Miranda rights. Benge then gave the police a tape-recorded statement in which he recounted a different version of what happened the night before. Benge told police that he had driven to the riverbank with Gabbard so that they could talk. He said that they had argued over the fact that he was addicted to crack cocaine. Gabbard also accused him of being unfaithful to her. Benge then said he got out of the vehicle to urinate. At that point, he said Gabbard tried to run him down, but the car got stuck in the mud. Benge said that he became enraged, pulled Gabbard out of the car, and began beating her with a metal pipe he found lying on the ground. Benge said he threw her body into the river, face down, disposed of the weapon and swam across the river. He did not recall whether he put any rocks or cement on her body. Benge then went to the home of his friend, John Fuller, to get dry clothes, which Fuller's fiancee, Awantha Shields, provided.

During this second interrogation, Benge was questioned about the ATM card, why he had dropped it when he saw the police, and whether he had used it after killing Gabbard. Benge said he threw down the card because he was scared and he knew he would not need it anymore. He also told police that he had not used the card since he killed Gabbard, although he did allow a man by the name of Baron Carr to use the card once to get money to purchase crack cocaine. Benge claimed that the only reason he had the card in his possession was because he and Gabbard had used it on January 31, 1993 before they went out that evening. However, the police discovered through retrieving ATM records that no transaction had taken place on January 31, 1993 and that two transactions were made following Gabbard's death; on February 1, 1993 at 2:45 a.m., a $200 withdrawal was made, and on February 2, 1993 at 12:01 a.m., another $200 was withdrawn.

Benge was indicted on one count of aggravated murder in violation of R.C. 2903.01(B) with death penalty specifications under R.C. 2929.04(A)(3) (offense committed for the purpose of escaping detection for another offense) and R.C. 2929.04(A)(7) (offense committed during the commission of an aggravated robbery) as well as for aggravated robbery and gross abuse of a corpse. Benge pleaded no contest to gross abuse of a corpse. The case proceeded to trial on the other charges.

At trial, the state called Awantha Shields, who testified that in the early morning hours of February 1, 1993, Benge arrived at the house she shared with John Fuller, wearing wet clothes and asking for John. Benge also asked her if she had ever killed anyone. He then told her that he and his girlfriend had "got into it" earlier, that it blew over, and that they went to the river bank. He then told her that they had started fighting and that he hit her in the head no more than ten times with a crowbar, put rocks over her head and pushed her in the river. Benge told her that he had killed his girlfriend to get her "Jeanie" card. He also said that if the police questioned him he would lie and say that a couple of black guys jumped him and his girlfriend and beat his girlfriend up. He also told her that he had given her ATM card to a guy named Baron to get $200 to buy crack cocaine but that he never saw the money.

Larry Carter testified that he and Baron Carr ran into Benge in the early morning of February 1, 1993. Benge, whose clothes were wet, asked Carter to excuse how he smelled but that he had just swum in the river. Carter thought Benge was kidding. Benge told him he had given John $20 to buy crack cocaine for him and said that he could get more money. Carter drove Benge and Carr to a Society

Bank where Benge withdrew $200 from an ATM; Carter then bought crack cocaine for Benge. Carter later drove Benge to Fuller's house. Later that next night, Carter and Baron Carr withdrew another $200 from Gabbard's account using her ATM card so that they could buy drugs for Benge. However, to avoid giving the drugs or money to Benge, the two men conjured up a story and told Benge that his girlfriend had closed the account. Benge insisted that she had not.

Benge took the stand on his own behalf and reiterated what he had told police during his second interrogation, including that Gabbard had tried to run him down and that he was in a rage when he killed her. Benge also claimed that he had permission to use Gabbard's ATM card and did not rob her. On cross-examination, he admitted losing his job in January 1993 due to his crack cocaine habit and that he had no income at the time he killed Gabbard.

Benge was convicted of all counts and specifications. Thereafter, the jury recommended that he be sentenced to death, and that recommendation was accepted by the trial court. The court of appeals affirmed Benge's convictions and death sentence.

The Ohio Supreme Court also affirmed Benge's convictions and death sentence. *Id*. at 1029. After being denied any relief in state postconviction proceedings, Benge filed a petition for habeas corpus in the district court, raising sixteen claims for relief. *Benge v. Johnson*, 312 F. Supp. 2d 978, 986 (S.D. Ohio 2004). The district court denied Benge's petition, *id*. at 1037, but granted a Certificate of Appealability (COA) as to seven of the claims.

## II.   ANALYSIS

### A.     Standard of review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court

may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (quoting 28 U.S.C. § 2254(d)). This standard requires that federal courts give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).

The first line of analysis under AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id*. at 409-11.

The second line of analysis under AEDPA concerns findings of fact made by the state courts. AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas

corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The appeals court gives complete deference to the federal district court's and state court's findings of fact supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004) (citations omitted).

**B.      Summary of Benge's claims on appeal**

The seven issues covered by the COA are as follows: (1) whether the prosecution withheld favorable evidence, (2) whether the defense counsel had an actual conflict of interest, (3) whether prosecutorial misconduct in the guilt and penalty phases violated Benge's constitutional rights, (4) whether a jury instruction incorrectly precluded the jury from considering the affirmative defense of voluntary manslaughter, (5) whether there was sufficient evidence to support Benge's convictions, (6) whether outbursts by the victim's family both inside and outside of the courtroom violated Benge's constitutional rights, and (7) whether Benge's counsel was ineffective.

After carefully considering the record on appeal, the briefs of the parties, and the applicable law, and having had the benefit of oral argument, we find no error in the district court's denial of Benge's habeas corpus petition. Because the reasoning that supports the judgment for the warden has been clearly and persuasively articulated by the district court in two thorough and comprehensive opinions, the issuance of a detailed written opinion by us on all seven issues would be unduly duplicative. We therefore adopt the reasoning of the district court as to issues (3), (5), (6), and (7) without further comment, but offer additional analysis on issues (1), (2), and (4), which are the ones that occupied the majority of the time at oral argument.

**C.      Whether the prosecution impermissibly withheld evidence that was favorable to Benge**

Benge contended in his state postconviction proceedings that the prosecution withheld potentially exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The information that Benge contends was not properly disclosed consists of a statement that Fuller gave to the police and Fuller's grand jury testimony. In the statement, Fuller said that he was home when Benge arrived on the night of the murder, and he described several incriminating statements made by Benge. Fuller also said that he may have missed parts of the conversation between Benge and Shields. In his grand jury testimony, Fuller said that he got home after Benge was already there, and that he spoke with Benge outside of Shields's presence, at which time Benge made a number of incriminating statements. *State v. Benge*, No. CA 97-08-163, 1998 WL 204941, at *4-5 (Ohio Ct. App. 1998). According to Benge, this information could have been used to impeach Shields's testimony concerning the alleged admissions by Benge on the night of the murder. *Id*.

*1.      Ohio Court of Appeals ruling*

The Ohio Court of Appeals is the last state court to review this issue that Benge raised in postconviction proceedings. It performed a detailed examination of Fuller's statement to the police and grand jury testimony prior to Benge's trial, and his deposition testimony and affidavit following Benge's convictions. *Id*. at *4-6. According to the state court, Fuller's statement and grand jury testimony were not favorable to Benge because they would not have impeached Shields, but instead would have bolstered her testimony. *Id*. at *6. The court then went on to address Fuller's postconviction affidavit, which claims that Benge was never alone with Shields and that Benge never stated that he killed Gabbard for her ATM card. It concluded that the affidavit was not credible because it completely contradicted Fuller's statement to the police and grand jury testimony, and that such recantations are deemed unreliable. *Id*.

## 2.        *District court ruling*

After the district court initially found that Benge had withdrawn his *Brady* claim, Benge asked the court to reconsider its ruling. Out of "an abundance of caution," the district court granted the motion to reconsider its original disposition of this claim and issued a separate opinion denying the claim on the merits. *Benge v. Johnson*, No. C-1-98-861, slip op. at 1-12 (S.D. Ohio July 7, 2004). In that opinion, the district court concluded that the Ohio Court of Appeals had not unreasonably applied clearly established federal law or unreasonably determined the facts based on the evidence presented. *Id*. at 12. The district court also performed a detailed review of the evidence and agreed with the Ohio Court of Appeals that Fuller's statement and grand jury testimony were not exculpatory evidence subject to *Brady* disclosure. *Id*.

## 3.        *Our review*

*Brady* requires the government to "turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment," *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987), including evidence that could be used the impeach the credibility of a government witness. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). In order for evidence to be considered "material," the court must conclude that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ritchie*, 480 U.S. at 57 (quotation marks omitted).

We agree with the district court that the Ohio Court of Appeals did not unreasonably apply *Brady* and its progeny. *Benge*, No. C-1-98-861, slip op. at 12 (S.D. Ohio July 7, 2004). Because the content of Fuller's statement and grand jury testimony did not undercut Shields's trial testimony, such evidence would not have been exculpatory. Furthermore, even if the evidence could be characterized as exculpatory, it was not material because disclosure of the evidence would not have given rise to a reasonable probability that the result of the proceeding would have been different. Even if the version of events contained in Fuller's affidavit (i.e., that at no time was Benge alone with Fuller and that Benge never said that he had killed Gabbard for her ATM card) had been presented at trial, Fuller's own prior statements to the contrary could have been used to impeach his new version of the events. We find no reasonable probability that the result of the trial would have been different had such conflicting statements been presented to the jury.

In addition to the foregoing, we note that Fuller's statement and grand jury testimony were not subject to *Brady* disclosure for two other reasons. First, Benge knew the essential facts that would have permitted him to take advantage of Fuller's allegedly exculpatory evidence. *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) ("No *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available to defendant from another source.") (citations and quotation marks omitted).

Benge claims that the issue is not about what he recalled happening at Fuller and Shields's house, but about what Fuller remembered and would testify to. But Benge heard Shields's testimony concerning his alleged admission that he murdered Gabbard for her ATM card. If Benge believed that Shields was lying because in fact the two of them were never out of Fuller's presence, Benge could have called Fuller as a witness to testify about the night in question and thus contradicted Shields. Benge, in other words, knew the essential facts permitting him to take advantage of what Fuller may have been able to say on the subject because he knew that Fuller was in the house that night.

Second, the evidence about what Fuller could testify to was not suppressed by the state. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (holding that in order to find a *Brady* violation,

"the evidence must have been suppressed by the State, either willfully or inadvertently"). Fuller's refusal to speak with counsel for Benge did not result from any action by the state, but from Fuller's dissatisfaction with the way one of Benge's counsel was representing Fuller in his own unrelated case. No matter how unfortunate for Benge, this was simply not of the prosecutor's doing.

**D.      Whether Benge was deprived of the effective assistance of counsel due to his attorney's alleged conflict of interest arising out of representation of a potential witness in an unrelated matter**

In Benge's state postconviction proceedings, he argued that he was denied the effective assistance of counsel because his trial lawyer represented Fuller in an unrelated drug case. *Benge*, 1998 WL 204941, at *6-7. Craig Hedric, one of Benge's two trial counsel, tried to interview Fuller about Benge's case. Fuller signed an affidavit describing what happened next: "Hedric 'came to ask me questions about [appellant's] case. I tried to ask Hedric about my pending drug case, but he only wanted to talk about [appellant's] case. I refused to talk about [appellant's] case because I was angry with Hedric for neglecting my case.'" *Id*. at *6 (alterations in original). Benge argued that, as a result of Hedric's representation of Fuller, Hedric did not learn of allegedly critical information that could have been used to impeach Shields.

### 1.      *Ohio Court of Appeals ruling*

The Ohio Court of Appeals, the last state court to address this issue on postconviction review, cited the Supreme Court's decision in *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), as the controlling authority. In *Cuyler*, the Court held that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id*. Benge failed to satisfy that test, according to the Ohio Court of Appeals, because Benge's and Fuller's cases "were completely unrelated," so Hedric did not have a conflict of interest as contemplated in *Cuyler*. *State v. Benge*, No. CA97-08-1631998, WL 204941, at *7 (Ohio Ct. App. 1998). Furthermore, the Ohio court noted that "even if Hedric had spoken with Fuller, Fuller's testimony would have inculpated rather than exculpated" Benge. *Id*.

### 2.      *District court ruling*

According to the district court, the Ohio Court of Appeals decision was not an unreasonable application of *Cuyler*. *Benge*, 312 F. Supp. 2d at 991-97. In *Smith v. Hofbauer*, 312 F.3d 809, 818 (6th Cir. 2002), this court clarified that *Cuyler* applies "only to joint representation and the Supreme Court has yet to extend [that case's rule to] reach . . . any other type of conflict." The district court noted that the alleged conflict of interest in this case did not arise out of the joint representation of codefendants in the same trial. Citing *Smith*, the district court therefore concluded that the Ohio Court of Appeals did not unreasonably apply *Cuyler*.

### 3.      *Our review*

We agree with the Ohio Court of Appeals and the district court. *Smith* forecloses Benge's argument because there is no clearly established federal law upon which to base the habeas claim in question. That precedent makes clear that *Cuyler* covers only cases of "joint representation at trial." *Smith*, 312 F.3d at 815. In the present case there is no dispute that Hedric represented Benge and Fuller in completely unrelated criminal cases. Because Benge cannot cite any clearly established federal law that the Ohio Court of Appeals improperly applied, he fails to meet his burden on this claim.

The district court went on to complete a full *Strickland* analysis in addition to concluding that *Cuyler* did not cover the factual circumstances present in this case. To the extent that Benge

could have challenged the district court's conclusion that trial counsel was not ineffective under a traditional *Strickland* analysis (as opposed to under *Cuyler*), he has waived any such claim on appeal. In his main brief, Benge never presents a generic ineffective-assistance-of-counsel claim (as opposed to a *Cuyler* claim for the alleged conflict of interest), and in his discussion of the claim in his reply brief, he alludes to the presence of *Strickland* prejudice only in the last line, where he states: "Whether or not prejudice is presumed — which it should be — the record plainly demonstrates that Michael Benge was prejudiced by the representation provided by counsel with divided loyalties." This single sentence in a reply brief is insufficient to preserve the claim. "[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (quotation marks omitted).

### E.    Whether the trial court improperly instructed the jury that it could not consider Benge's guilt as to the charge of voluntary manslaughter if it concluded that he was guilty of aggravated murder

After the trial court instructed the jury on the elements of aggravated murder, it further instructed the jury as follows: "If you find that the State proved beyond a reasonable doubt all of the essential elements of aggravated murder, your verdict must be guilty of that offense and in that event you will not consider any lesser charge." *State v. Benge*, 661 N.E.2d at 1024. According to the trial court, the jury could consider the offense of voluntary manslaughter only if the state failed to prove aggravated murder or aggravated robbery. *Id*.

#### 1.    *Ohio Supreme Court ruling*

Because the Ohio Supreme Court on direct appeal decided this issue on the merits, the Ohio Court of Appeals in the postconviction proceedings declined to consider the claim again, citing the doctrine of res judicata. The Ohio Supreme Court disagreed with the trial court and concluded that "the jury should have been instructed to consider the mitigating evidence to determine whether appellant proved voluntary manslaughter." *Id*. at 1025. This was because, under Ohio law, evidence to support a voluntary manslaughter conviction can mitigate a finding of aggravated murder in addition to separately establishing a lesser offense. *Id*. Despite the trial court's error, however, the Ohio Supreme Court declined to reverse Benge's conviction. It determined that reversal would be required only if the error was "plain" because Benge's counsel had failed to object to the jury instructions. *Id*. The error was not plain, according to the Ohio Supreme Court, because it did not clearly affect the outcome of the trial. *Id*. A lack of evidence of provocation persuaded the Court that reversal was not warranted:

> The only evidence of provocation was appellant's testimony that the victim tried to run him over and that he became enraged. However, the physical evidence, including the presence of blood and hair on the tire and both sides of the tire track, indicates that appellant may have driven the car through a pool of blood after he beat the victim. The testimony of several state witnesses further supports the state's version of what occurred rather than appellant's. Thus, there was sufficient evidence to support appellant's convictions. Based on the evidence presented, we find no plain error with the court's instructions. Accordingly, appellant's first proposition of law is overruled.

*Id*.

#### 2.    *District court ruling*

The district court took a slightly different approach, but came to the same conclusion. According to the district court, the Ohio Supreme Court's treatment of the issue under a plain error

standard evidenced the fact that the claim was procedurally defaulted. *Benge*, 312 F. Supp. 2d at 988-91. Benge attempted to excuse his procedural default based on the ineffectiveness of his trial attorneys. This required an analysis under *Strickland v. Washington*, 466 U.S. 668 (1984), as to whether Benge had demonstrated deficient performance and actual prejudice. The district court concluded that the jury instruction was erroneous, which satisfied the first *Strickland* prong because defense counsel should have objected. *Benge*, 312 F. Supp. 2d at 988.

With respect to the question of actual prejudice, the district court agreed with the Ohio Supreme Court that the evidence in the case did not support, and in fact contradicted, Benge's claim that he was provoked into killing Gabbard. Furthermore, the district court concluded that the jury had accepted the government's version of the events and rejected Benge's own version, based on the fact that he was convicted of aggravated robbery for taking the bank card and of aggravated murder. The district court therefore concluded that any error of law in the jury instruction did not affect the outcome of the case. *Id.* at 988-91.

### 3.        *Our review*

We note as an initial matter that AEDPA's mandate to defer to state court judgments does not factor into our resolution of this issue. As set forth in Part II.E.1. above, the Ohio Supreme Court analyzed the effect of the unobjected-to jury instruction only in the context of plain-error review, not under the governing—and less burdensome—*Strickland* standard. Because Benge could have met his burden under *Strickland* despite not being able to demonstrate plain error, this analysis did not constitute an "adjudication on the merits" of Benge's ineffective-assistance-of-counsel claim. *See Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) ("The AEDPA standard of review applies only to 'any claim that was adjudicated on the merits in State court proceedings.'" (quoting 28 U.S.C. § 2254(d))).

The earlier judgment of the Ohio Court of Appeals was also insufficient to warrant AEDPA deference. Although that court applied the proper standard, it never reached the now-dispositive prejudice prong, instead denying Benge's claim on the ground that his counsel had not been deficient. *State v. Benge*, No. CA 93-06-116, 1994 WL 673126, at \*21 (Ohio Ct. App. Dec. 5, 1994) ("[T]here is no demonstration that trial counsel's performance was deficient or that were it not for counsel's alleged errors, the result of the trial or the sentencing decision would have been different."). In sum, there was no reasoned adjudication of Benge's ineffective-assistance-of-counsel claim on the merits by the Ohio state courts. AEDPA is therefore inapplicable, making our review de novo. *Danner*, 448 F.3d at 376 (reviewing Danner's Sixth Amendment claim de novo "because no state court reviewed his constitutional challenge on the merits").

We nonetheless concur in the result reached by the district court. In attempting to excuse his procedural default, Benge must demonstrate "that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). Because we conclude that Benge has failed to show the actual prejudice necessary to excuse his procedural default, we will assume without deciding that the district court correctly determined that the first prong of *Strickland* was satisfied.

Benge argues, however, that prejudice under *Strickland*'s second prong should be presumed because defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, relying on the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 659 (1984). But the Supreme Court has clarified that the *Cronic* presumption applies only where defense counsel *completely* or *entirely* fails to oppose the prosecution throughout the guilt or penalty phase *as a whole*. *Bell v. Cone*, 535 U.S. 685, 697 (2002) (interpreting the *Cronic* presumption of prejudice for failure to test the government's case as covering only the "complete" failure of defense

counsel to perform during the "proceeding as a whole," not a failure at "specific points"). Here, counsel's failure to object to the erroneous jury instruction, no matter how professionally unreasonable, was not a complete failure to provide a defense. The presumption of prejudice therefore does not apply, so Benge must demonstrate that he suffered from actual prejudice.

Under *Strickland*, in order to show actual prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In terms of this case, then, the issue is whether, but for defense counsel's failure to object to the erroneous jury instruction, there is a reasonable probability that the outcome of Benge's case would have been different.

Benge's voluntary-manslaughter alternative to the aggravated-murder charge hinged on a showing that he was "under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force" at the time he murdered Gabbard. *See* Ohio Rev. Code Ann. § 2903.03(A). The Ohio Supreme Court has held that this is the defendant's burden, and the showing must be made by a preponderance of the evidence. *State v. Rhodes*, 590 N.E.2d 261, 265 (Ohio 1992) (placing on the defendant, in a trial for aggravated murder, the burden of proving by a preponderance of the evidence that the requisite state of passion or rage was present at the time of the murder in order for the defendant to be convicted of voluntary manslaughter rather than aggravated murder).

In attempting to meet his burden, Benge testified that he became enraged when Gabbard tried to run him over. This testimony constituted the entirety of the evidence supporting his affirmative provocation defense. But other portions of Benge's testimony, as well as additional evidence introduced by the government, seriously undercut his version of the events. When initially questioned by the police, for example, Benge concocted a cover story of how two unidentified black men had murdered Gabbard. In addition, Shields testified that Benge had told her on the night of the murder that attaining Gabbard's ATM card was his motivation for killing her. Benge attempted to undermine Shields's testimony at trial, testifying that he had been in possession of Gabbard's ATM card *before* the murder and that he had never robbed her of the card. But the jury necessarily disbelieved this testimony, because it would not and could not have found Benge guilty of aggravated robbery had it found that Benge possessed the ATM card prior to the murder. Finally, there was the physical evidence of a pool of blood on the ground with a tire track running through it, as well as blood in the tire treads. This evidence refutes the sequence of events Benge described—that Gabbard tried to run him over, the car got stuck in the mud, and *then* he killed her.

The common definition of the phrase "preponderance of the evidence," as found in law treatises and standard jury instructions, is evidence that is of greater weight, on balance, than that offered in opposition to it. *See, e.g.*, 32A C.J.S. *Evidence* § 1312 (2006). In light of the evidence presented both in favor of and against Benge's claim of provocation, we see no reasonable probability that a juror would have found that Benge had proved serious provocation by a preponderance of the evidence. *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). We are thus persuaded that there is no reasonable probability that a juror would have accepted Benge's voluntary-manslaughter defense, even if the jury had been properly instructed. This being so, defense counsel's alleged ineffectiveness cannot meet the cause-and-prejudice standard as necessary to excuse Benge's procedural default.

The dissent correctly notes that the erroneous jury instruction effectively foreclosed the *possibility* that the jury could have found Benge guilty of the robbery but not guilty of the murder.

Dissenting Op. at 14. We also recognize, as the dissent emphasizes and as the district court itself acknowledged, that "[a] conviction for aggravated robbery does not as a matter of law preclude an affirmative defense of provocation with regard to a related murder charge." *Id.*; *Benge*, 312 F. Supp. 2d at 990 ("In theory, petitioner could have been found guilty of aggravated robbery without having been found guilty of aggravated murder."). But the dissent fails to persuade us that there is a reasonable probability that a properly instructed jury would have concluded that Benge met this affirmative burden. Instead, the dissent simply notes that

> [b]ased on the evidence presented in this case, Benge *could have* had no plan to rob or murder Gabbard when they got in the car together. He *could have* then been provoked by her fighting with him, and attacked her in response, consistent with his testimony at trial. Upon concluding his attack on Gabbard, it *could have* occurred to him to take the ATM card from her before disposing of her body in the river.

Dissenting Op. at 14 (emphasis added).

What Benge *could have* done, however, is irrelevant at this stage in the proceedings. We must be able to say that a reasonable probability exists that a properly instructed jury *would have* concluded that Benge had shown provocation by a preponderance of the evidence. Given that Benge's provocation defense rested almost exclusively on his own extremely dubious and at times inconsistent testimony, we are unable to so conclude.

Both Benge and the dissent attempt to overcome the foregoing analysis by relying on the case of *Barker v. Yukins*, 199 F.3d 867, 874 (6th Cir. 1999), for the proposition that the jury, not a reviewing court, is the proper decisionmaker on the question of whether Benge met his burden of proving adequate provocation. In *Barker*, the defendant went to trial on a charge of first-degree murder. *Id.* at 869. She alleged that the killing was in self-defense because the victim, an 81-year-old man, was attempting to rape her. *Id.* The trial court refused to specifically instruct the jury that Barker was entitled to use deadly force in self-defense in order to resist an imminent rape, instead delivering the general self-defense instruction permitting the use of lethal force if the victim honestly believed that she was "in danger of death or serious bodily injury." *Id.* at 870. On direct appeal, the Michigan Supreme Court found that the trial court erred in refusing to give the specific instruction, but that the error was harmless because no reasonable juror would have believed Barker's self-defense claim in light of the fact that the alleged perpetrator was "enfeebled" and that Barker had delivered 10 blows to the victim's head and stabbed him 32 times. *Id.*

This court in *Barker* had to decide "whether the Michigan Supreme Court's finding of harmless error involved an unreasonable application of federal law." *Id.* at 872. Essentially two reasons were given in support of the conclusion that the state court had unreasonably applied federal law in its harmless-error analysis. First, this court stated that the general self-defense instruction left the door open for the jury to find that Barker understood that she was going to be the victim of an imminent rape, but that she was not about to be subjected to death or serious bodily injury. *Id.* at 873. That possibility caused this court to have "grave doubt as to whether the erroneous jury instruction created a substantial and injurious influence on the verdict." *Id.* at 874. Furthermore, this court went on to state that the Michigan Supreme Court's harmless-error analysis "improperly invaded the province of the jury" in determining that "no reasonable juror could have believed that the force used by Barker was necessary to prevent rape by an 81-year old 'enfeebled' man." *Id.* According to this court, the proper role of a judge in reviewing a conviction is not "to stand in the place of the jury, weighing competing evidence and deciding that some evidence is more believable than others." *Id.* at 874-75. This court thus concluded that the Michigan Supreme Court unreasonably applied federal law. *Id.* at 876.

*Barker* does not foreclose our analysis as set forth above, however, because it arose in a completely different context. This court in *Barker* was evaluating a harmless-error analysis undertaken by a state court on direct review. Here we are not reviewing the merits of the underlying claim, but are instead inquiring whether the alleged ineffective assistance of Benge's counsel in failing to object excuses the procedural default. In evaluating claims of ineffective assistance of counsel, this court must typically assess the evidence introduced at trial in order to determine whether the defendant was prejudiced. *See, e.g.*, *Strickland*, 466 U.S. at 695 ("In making this determination [of whether the alleged ineffectiveness of counsel prejudiced the defendant], a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Hodge v. Hurley*, 426 F.3d 368, 376 n.17 (6th Cir. 2005) ("[T]he prejudice determination is necessarily affected by the quantity and quality of other evidence against the defendant."). We see nothing in *Barker* to preclude our review of the evidence in assessing whether the ineffective-assistance claim excuses a procedural default. Benge's reliance on that case is therefore unavailing.

Because we conclude that Benge has failed to demonstrate that the ineffectiveness of his counsel resulted in actual prejudice, the procedural default of his jury-instruction claim is not excused. We therefore concur in the district court's analysis on this issue.

Finally, we note that evidence of arbitrariness in the enforcement of the death penalty in this country, no matter how compelling, does not afford Benge a basis for habeas relief under existing Supreme Court jurisprudence. Instead, as the dissent concedes, arbitrariness-based arguments are and will remain "only [] observations without the force of law" until the Supreme Court says otherwise. Dissenting Op. at 19. We accordingly see no need to engage in a further policy debate in the context of the present case.

## III. CONCLUSION

For all of the reasons set forth above, as well as for the reasons set forth in the opinions of the district court entered on March 31, 2004 and July 7, 2004, we **AFFIRM** the judgment of the district court.

————————

**DISSENT**

————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting.

I.

Although I agree with the bulk of the majority's analysis, I believe that Benge has presented one meritorious claim that should entitle him to a writ of habeas corpus. When Benge's attorney failed to object to the jury instructions regarding the lesser included offense of voluntary manslaughter, resulting in a jury charge that the Ohio Supreme Court later acknowledged was erroneous, he failed to provide Benge effective assistance of counsel. Because I believe a habeas writ should issue regarding that claim under *Strickland v. Washington*, 466 U.S. 668 (1984), I respectfully dissent.

In order to make out an ineffective assistance of counsel claim under *Strickland*, "a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the defendant was prejudiced by the attorney's error." *Dando v. Yukins*, 461 F.3d 791, 798 (6th Cir. 2006). The district court correctly determined that trial counsel's failure to object to the jury instruction fell below an objective standard of reasonableness, due largely to the fact that the instruction regarding voluntary manslaughter was clearly erroneous, rendering the failure to lodge an objection to the instruction objectively unreasonable.[1] *Benge v. Johnson*, 312 F. Supp. 2d 978, 988 (S.D. Ohio 2004). Moreover, as Benge points out on appeal, trial counsel's strategy involved calling Benge to testify and admit to killing Gabbard, while contending that he acted in a passion or sudden fit of rage after she provoked him by attempting to run him over with the car. After establishing this record, it was imperative to Benge's defense that the jury charge include a correct instruction regarding voluntary manslaughter as an affirmative defense. Thus, trial counsel put all of Benge's eggs in the basket of voluntary manslaughter based on the mitigating circumstances of sudden passion or fit of rage, but then dropped the basket (and maybe even stepped on the eggs) by not even seeking a jury instruction consistent with this theory of the case. This abandonment of Benge's trial theory at the jury instruction stage clearly falls below the objective standard of reasonableness required of counsel under *Strickland*.

The more contentious point involves the second prong under *Strickland*, which examines whether Benge was prejudiced by counsel's mistake. The district court concluded that Benge could not establish prejudice, reasoning that because the jury convicted Benge of aggravated robbery in addition to aggravated murder, it necessarily rejected his version of events, including his testimony that Gabbard had provoked him into a fit of rage. *Benge*, 312 F. Supp. 2d at 991. Under this view, even though the jury instructions effectively precluded the jury from considering the lesser included offense of voluntary manslaughter, the omission could not have prejudiced Benge because "the jury necessarily rejected his defense of sudden passion and provocation." *Id*. The majority similarly concludes, based on its independent assessment of the evidence at trial, that there is no reasonable probability of a juror believing that Benge was seriously provoked. Maj. Op. at 16. I respectfully disagree with this analysis.

————————————————

[1] The trial judge instructed the jury "[i]f your verdict is guilty [on the charge of aggravated murder], proceed to Specification One and Two and **do not consider lesser included charges**." *State v. Benge*, 661 N.E.2d 1019, 1024 (Ohio 1996) (emphasis added). As the Ohio Supreme Court determined, the instruction was incorrect as a matter of Ohio law because voluntary manslaughter is a lesser included offense of aggravated murder, and consequently "the jury should have been instructed to consider the mitigating evidence to determine whether appellant proved voluntary manslaughter." *Id*.

The majority correctly notes that based on *Strickland*, "the issue for the state courts was whether, but for defense counsel's failure to object to the erroneous jury instruction, there was a reasonable probability that the outcome of Benge's case would have been different." Maj. Op. at 10. The majority is also correct that AEDPA's deferential standard of review is inapplicable here, given the shortcomings of the state appellate courts' review of this issue. Considering Benge's claim de novo, as we are required to do by the omissions of the state courts, I would find that he is entitled to a habeas writ.

Based on the evidence at trial, a reasonable juror could have accepted aspects of both the prosecution and defense arguments, and determined that Benge was first provoked by Gabbard, and subsequently killed and robbed her. A conviction for aggravated robbery does not as a matter of law preclude an affirmative defense of provocation with regard to a related murder charge.[2] Because there is no planning or premeditation required for a robbery conviction, the robbery conviction does not defeat the possibility that there was also provocation. Based on the evidence presented in this case, Benge could have had no plan to rob or murder Gabbard when they got in the car together. He could have then been provoked by her fighting with him, and attacked her in response, consistent with his testimony at trial. Upon concluding his attack on Gabbard, it could have occurred to him to take the ATM card from her before disposing of her body in the river. Under this set of facts, Benge could establish the affirmative defense of provocation with regard to the murder charge, even though he would still be guilty of aggravated robbery, for inflicting serious harm on another while committing a theft offense and/or for using a dangerous weapon in committing a theft offense.

Given the trial court's instruction, however, the very real possibility of the jury finding both aggravated robbery and provocation was foreclosed. I disagree with the district court's conclusion that "it is impossible to conclude that the mistake had any bearing on the conclusions reached by the jury in this case." *Benge*, 312 F. Supp. 2d at 991. Because as a matter of law the jury could have found both that Benge was provoked and was guilty of robbery, I believe that there is a reasonable probability that the mistake affected the verdict by eliminating the possibility of such a finding and the consequent verdict that Benge was guilty of voluntary manslaughter instead of aggravated murder. This probability caused Benge prejudice under the second prong of *Strickland*.

I also disagree with the majority's assessment of the evidence, and its conclusion that "there is no reasonable probability that a juror would have accepted Benge's voluntary-manslaughter defense, even if the jury had been properly instructed." Maj. Op. at 10. Whatever doubts we as judges may have about Benge's testimony, the Sixth Amendment prohibits the substitution of a court's judgment for that of the jury. *See Barker v. Yukins*, 199 F.3d 867, 874 (6th Cir. 1999) ("[T]he Michigan Supreme Court's determination that the erroneous jury instruction was harmless necessarily means that the court believed some evidence but discredited other evidence. This, however, it cannot do and remain in compliance with our constitutional guarantees.").[3] Although

---

[2]The Ohio aggravated robbery statute provides as follows:

§ 2911.01. Aggravated robbery
(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
      (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
      (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
      (3) Inflict, or attempt to inflict, serious physical harm on another.

[3]The majority states that *Barker* is inapposite because "it arose in a completely different context." Specifically, in *Barker*, this Court was evaluating a harmless error analysis undertaken by a state court on direct review, as opposed to the question here of whether a defendant was prejudiced by counsel's failure to request a correct jury instruction. I primarily cite to *Barker* for illustrative purposes, rather than as controlling precedent on the issue before us today. It is

we must assess the evidence presented at trial to evaluate the prejudice created by ineffective assistance of counsel, I believe that like the district court, the majority is too dismissive of the possibility that the jury may have partially believed Benge had it been properly instructed. Foreclosing this possibility necessarily required credibility determinations by the reviewing judges, including today's majority, which substitute a judge's view of the veracity of Benge's story over that of a properly instructed jury. Instead of receiving a jury's judgment on the most critical issue in his case — whether there was sufficient provocation to establish voluntary manslaughter — Benge has been given a death sentence based on the speculation of several judges as to how a hypothetical, properly instructed jury would have viewed the evidence.

The government's evidence that contradicted Benge's testimony is itself far from conclusive — Shields's testimony is subject to questions about credibility, and the significance of the tire running through blood is not entirely clear. Although Benge's testimony was not consistent with his statements after the incident, it does not automatically follow that his explanation of the events in his trial testimony would have necessarily been disregarded by the jury. I cannot agree with the majority's characterization of the evidence against Benge as "overwhelming," and I am not convinced that a properly instructed jury would have relied on this to disbelieve Benge's testimony regarding the fight. I am not under any delusion that Benge could be mistaken for the young George Washington of the cherry tree story, who could not tell a lie. But viewing the evidence, including Benge's testimony, in its entirety, there is a reasonable probability that the jury would have found that Benge and Gabbard indeed fought before the murder, and that this provocation was sufficient to render his offense voluntary manslaughter rather than aggravated murder.

Benge was in fact prejudiced by trial counsel's failure to object to the instruction because of the likely effect of the erroneous instruction on jury deliberations. Benge therefore meets the prejudice requirement and has established ineffective assistance of counsel under *Strickland*, as there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Because there can be little dispute that the failure to object to the erroneous jury instruction was deficient, and because it led to a prejudicial disregard of the lesser degree offense, I would find that Benge was denied the effective assistance

---

relevant authority for the point that whenever a court makes credibility determinations or otherwise overreaches in concluding that the evidence of guilt was overwhelming despite a significant mistake in instructing the jury — either a mistake by the trial court, which is subsequently deemed harmless, or by counsel, which is subsequently deemed non-prejudicial — it is invading the province of the jury. In both types of cases, assessing the evidence is an objective exercise, and it is not the role of a reviewing court to make credibility determinations. This point from *Barker* is equally applicable here, despite the fact that the issue before the Court was not identical to the present question.

Further, I am not convinced that the distinction between the issue presented in *Barker* and the issue here is as significant as the majority suggests. The standard for this Court's review of a state court's harmless error determination that was at issue in *Barker* is whether the error in question "had a substantial and injurious effect or influence in determining the jury's verdict and resulted in actual prejudice." 199 F.3d at 873. For purposes of our review of the state court's determination of the prejudice prong of an ineffective assistance of counsel claim, which is at issue in this case, we look to whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005). The standard in both types of cases requires us to assess the evidence and make some hindsight judgment as to the likelihood of guilt in a hypothetical trial where the error in question did not occur. The illustrative point from *Barker*, that applies with equal force here, is that where the error had a substantial effect (or there is a probability that the result of the proceeding would have been different but for the error), a judge's view of guilt is no substitute for that of the jury, and cannot be used to reason away the significance of the mistake.

of counsel on this claim, and that the habeas writ should issue on this ground.[4]  For this reason, I respectfully dissent from the majority's holding.

II.

I also continue to adhere to my belief that the arbitrary enforcement of the death penalty, in Ohio and elsewhere in this country, violates the Eighth Amendment's prohibition of cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause. *See Moore v. Parker*, 425 F.3d 250, 270 (6th Cir. 2005) (Martin, J., dissenting).  The indisputably faulty jury instructions in this case only reinforce those concerns.  While the version of the murder to which Benge confessed — and indeed, any version of any murder — was heinous and deserving of extreme punishment, it is troubling that his conviction and death sentence were returned by a misinstructed jury that was precluded from convicting him of a lesser included offense in contravention of state law.

Additionally, the only legal hook on which Benge's death sentence hangs is the jury's finding that he also committed aggravated robbery by stealing Gabbard's ATM card in the process of killing her.  I recognize that this is an aggravating factor under Ohio law, which the Ohio legislature likely requires in order to comply with *Gregg v. Georgia*, 428 U.S. 153 (1976), and its progeny so as to attempt to combat the arbitrary enforcement of the death penalty.  Even so, the imposition of a death sentence in this case on the basis of that factor strikes me as promoting, rather than preventing, the arbitrary application of the death penalty.  Had Benge impulsively and fatally hit his common law wife in the head with a tire iron in an abhorrent act of extreme domestic violence, instead of killing her to gain access to her ATM card, as the prosecution alleged and the jury supposedly found, would his conduct somehow be less heinous and reprehensible?  Such a murder would be at least as revolting as the one that occurred here, yet as far as I can tell, would have presented none of the aggravating factors required for a death sentence under Ohio law.  Benge's actions can certainly not be taken lightly in any respect, but his "theft" of an ATM card — to which it appears he had shared access with Gabbard in the past — as a means of accessing money to support his drug habit, is better characterized as a pathetic act of a sick and miserable man than as a factor that makes this murder more heinous or deserving of the death penalty than any other.  In fact, in the same month this panel heard oral argument in this case, I sat on a panel in another habeas corpus case stemming from an Ohio state court conviction where a defendant who planned and led the firebombing of a house that caused the deaths of five people, four of whom were children, was not given the death penalty.  *See Williams v. Haviland*, 467 F.3d 527 (6th Cir. 2006). Of this admittedly small sampling, any neutral observer would be hard pressed to identify Benge as the defendant more deserving of execution.

I fully recognize that the ability of the jury to sentence one defendant to death while sentencing another, convicted of an arguably more heinous crime, to life in prison, is a natural function of the Supreme Court's ruling that the Sixth Amendment requires a jury to determine the presence of aggravating factors that warrant the death penalty.  *See Ring v. Arizona*, 536 U.S. 584,

---

[4]The majority primarily frames the ineffective assistance of counsel issue as creating cause and prejudice for Benge's procedural default, whereas I have primarily addressed his freestanding ineffective assistance of counsel claim. There are nuanced differences between these two analytical approaches. *See Joseph v. Coyle*, 2006 U.S. App. LEXIS 27697, at *46 (6th Cir. 2006) ("Although Joseph must satisfy the AEDPA standard with respect to his independent [ineffective assistance of counsel] claim, he need not do so to claim ineffective assistance of counsel for the purpose of establishing cause."). I do not believe that these differences are particularly relevant here, given that both the majority and I address Benge's *Strickland* claim de novo. I would thus grant the writ either on the ground that Benge established cause and prejudice with regard to his erroneous jury instruction claim, or the roughly related independent ineffective assistance of counsel claim. *See id.* ("[Petitioner] has established his [ineffective assistance of counsel] claim under the AEDPA standard, which necessarily means that he has also established ineffective assistance of counsel for the purpose of establishing cause.").

589 (2002). I also believe that the Supreme Court has generally made an earnest effort to require states to apply the death penalty in accord with the Constitution both through its Sixth Amendment holding in *Ring*, and by condemning the arbitrary enforcement of the death penalty under the Eighth and Fourteenth Amendments. *See Gregg*, 428 U.S. at 195; *Furman v. Georgia*, 408 U.S. 238 (1972). Even so, it appears to me that this case provides one of likely many examples of the validity of Justice Blackmun's observations in *Callins v. Collins*, 510 U.S. 1141, 1144 (1994) (Blackmun, J., dissenting from denial of certiorari), in which he acknowledged that "the constitutional goal of eliminating arbitrariness and discrimination from the administration of death can never be achieved without compromising an equally essential component of fundamental fairness — individualized sentencing."

Prior to *Callins*, Justice Blackmun had concurred in the results of Supreme Court opinions that affirmed death sentences, under the belief that certain procedural safeguards could eliminate arbitrariness in death sentencing. *See id.* In *Callins*, however, Justice Blackmun argued that it had become apparent that the Court could not have it both ways. He explained his revised view on the death penalty as follows:

> From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored — indeed, I have struggled — along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question — does the system accurately and consistently determine which defendants "deserve" to die? — cannot be answered in the affirmative. It is not simply that this Court has allowed vague aggravating circumstances to be employed, *see, e.g.*, *Arave v. Creech*, 507 U.S. 463 (1993), relevant mitigating evidence to be disregarded, *see, e.g.*, *Johnson v. Texas*, 509 U.S. 360 (1993), and vital judicial review to be blocked, *see, e.g., Coleman v. Thompson*, 501 U.S. 722 (1991). The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution.

*Callins,* 510 U.S. at 1145-46. The conclusion Justice Blackmun reached was that "the proper course when faced with irreconcilable constitutional commands is not to ignore one or the other, nor to pretend that the dilemma does not exist, but to admit the futility of the effort to harmonize them. This means accepting the fact that the death penalty cannot be administered in accord with our Constitution." *Id.* at 1157.

In accord with Justice Blackmun's comments, I do not believe that Benge's death sentence, or for that matter many of the death sentences that this Court has reviewed, reflects the product of "the system accurately and consistently determin[ing] which defendants 'deserve' to die." It is equally likely that Benge received a death sentence while other potentially more culpable convicted murderers in Ohio did not for entirely arbitrary reasons. One arbitrary and constitutionally troubling possibility is that Benge's death sentence turned more on the ability (or inability) of his trial counsel than on the facts of his crime. *See Moore*, 425 F.3d at 270 ("One of the most clear examples of the arbitrariness of the death penalty is the common knowledge that those defendants with decent lawyers rarely get sentenced to death."). This possibility is particularly likely here in light of counsel's failure to object to a jury instruction that contravened the entire theory of Benge's case,

as discussed above in Part I, as well as the adverse consequences resulting from counsel's concurrent representation of a potential defense witness in a drug case, and counsel's failure to object to several prejudicial statements during the penalty phase of the trial.[5]  *See Benge*, 312 F. Supp. 2d at 994-95, 1008-09.

Some judges view the situation quite differently, believing that the Sixth Amendment right to counsel, and the jurisprudence of this Court and the Supreme Court that require effective assistance of counsel, actually create incentives for defense counsel to intentionally provide constitutionally deficient representation in capital cases so that the resulting death sentences can later be thrown out on appeal. *See Poindexter v. Mitchell*, 454 F.3d 564, 588 (6th Cir. 2006) (Boggs, J., concurring) (speculating that the Sixth Amendment jurisprudence of this Court and the Supreme Court creates a "moral hazard" by encouraging intentional ineffective assistance of counsel); *Id.* at 589 (Suhrheinrich, J., concurring) ("I agree with Judge Boggs.").  As I have written elsewhere, *see Keith v. Mitchell*, 466 F.3d 540, 547 (6th Cir. 2006) (Martin, J., dissenting from denial of rehearing en banc), I believe this view is simply out of touch with the realities of criminal trial practice.  It would be a high-risk and misguided wager for an attorney to entrust her client's Sixth Amendment rights to a reversal on appeal by a federal habeas court in light of the ever-growing deference that is shown to "strategic" decisions by defense counsel and legal decisions of state courts, and the apparent trend of the federal judiciary becoming increasingly willing to play fast and loose with the individual protections guaranteed by the Constitution simply to avoid temporarily standing in the way of a state's rush toward death.[6]

The frequent findings of ineffectiveness of counsel in capital cases that Judge Boggs has documented have more to do with the fact that there is insufficient support, financial and otherwise, for attorneys representing capital defendants than it does with some scheme of providing intentionally deficient representation.  *See also Poindexter*, 454 F.3d at 590 (Daughtrey, J., concurring) (concluding "contrary to Judge Boggs's intimations, *not* that capital defense attorneys are engaged in a demented, premeditated game of 'gotcha' with the courts, but rather that those lawyers representing the absolute pariahs of society are frequently hamstrung by a critical lack of relevant experience, an obvious lack of time and resources, or both.") (emphasis in original).  Regrettably, the observations that Judge Daughtrey and I have made on this problem are nothing new, and have been documented, but not effectively remedied, for many years.  *See McFarland v. Scott*, 512 U.S. 1256, 1256 (2004) (Blackmun, J., dissenting from denial of certiorari) ("Without question, 'the principal failings of the capital punishment review process today are the inadequacy and inadequate compensation of counsel at trial.'") (quoting Ira Robbins, *Toward a More Just and Effective System of Review in State Death Penalty Cases, Report of the American Bar Association's Recommendations Concerning Death Penalty Habeas Corpus*, 40 AM. U. L. REV. 1, 16 (1990)).  In our capitalist society you get what you pay for.  We are yet to show a willingness to adequately compensate members of many professions (public school teachers, military and emergency response personnel, social workers, and yes, attorneys who represent indigent defendants, to name a few) whose competent performance is most important to the functioning of our democracy.

---

[5]Although I would agree with the district court's conclusion that there is an insufficient showing of prejudice for these latter two shortcomings to support viable habeas claims on their own, one cannot help but wonder whether the same result would have issued without the cumulative effect of the incorrect jury instruction, the cooperation of the witness that Benge claims was prevented by the concurrent representation, and the inflammatory comments during the penalty phase, all of which a fully competent defense attorney presumably would have prevented.

[6]*See Herrera v. Collins*, 506 U.S. 390, 446 (1993) (Blackmun, J., dissenting) ("I have voiced disappointment over this Court's obvious eagerness to do away with any restriction on the States' power to execute whomever and however they please.").

It is also very possible that the constitutionally impermissible factor of the race of Benge's victim played a role in his death sentence.  *See* Andrew Welsh-Huggins, *Race, Geography Can Mean Difference Between Life, Death*, THE ASSOCIATED PRESS, May 7, 2005 (explaining that a 2005 Associated Press study of Ohio death sentences found that "[o]ffenders facing a death penalty charge for killing a white person were two times more likely to go to death row than if they had killed a black victim. Death sentences were handed down in 18 percent of cases where the victims were white, compared with 8.5 percent of cases where victims were black."); David Baldus and George Woodworth, *Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception,* 53 DEPAUL L. REV. 1411, 1423-255 (2004) (concluding that nationwide "defendants with white victims are at a significantly higher risk of being sentenced to death and executed than are defendants whose victims are black, Asian, or Hispanic."); *see also McCleskey v. Kemp,* 481 U.S. 279, 286 (1987) (noting that among capital murder cases in Georgia during the 1970's, "defendants charged with killing white persons received the death penalty in 11% of the cases, but defendants charged with killing blacks received the death penalty in only 1% of the cases").  Benge could also have been sentenced to death by virtue of the entirely arbitrary factor of the location of his trial within Ohio.  *See* Welsh-Huggins, *supra* (noting a significantly higher rate of death sentences in capital trials held in Southern Ohio compared to Northern Ohio).  All of these possibilities underscore the merit of Justice Blackmun's prediction that "death will continue to be meted out in this country arbitrarily and discriminatorily." *Callins*, 510 U.S. at 1157; *see also Alley v. Little*, 447 F.3d 976, 978 (6th Cir. 2006) (Martin, J., dissenting from denial of rehearing en banc).

As I have previously stated, "I know my place in the judiciary," *Moore*, 425 F.3d at 270, and I recognize that unless and until the Supreme Court deems it necessary to address what I (like Justice Blackmun and others) view as the inherent arbitrariness of the death penalty, my reflections on this topic will only be observations without the force of law.  In the meantime, I add my voice to those dissenters who have hoped that the Supreme Court "eventually will conclude that the effort to eliminate arbitrariness while preserving fairness 'in the infliction of [death] is so plainly doomed to failure that it — and the death penalty — must be abandoned altogether.'" *Callins*, 510 U.S. at 1159 (Blackmun, J., dissenting from denial of certiorari, quoting *Godfrey v. Georgia*, 446 U.S. 420, 442 (1980) (Marshall, J., concurring in the judgment)).