*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0167p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee*,

> No. 11-6175

         *v.*

ABEL MARTINEZ TAVERA,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:10-cr-61-4—J. Ronnie Greer, District Judge.

Argued: May 1, 2013

Decided and Filed:  June 20, 2013

Before:  MERRITT, CLAY, and DONALD, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** A. Philip Lomonaco, THE LAW OFFICES OF A. PHILIP LOMONACO, Knoxville, Tennessee, for Appellant.  Donald Wayne Taylor, UNITED STATES ATTORNEY'S OFFICE, Greeneville, Tennessee, for Appellee. **ON BRIEF:** A. Philip Lomonaco, THE LAW OFFICES OF A. PHILIP LOMONACO, Knoxville, Tennessee, for Appellant.  Donald Wayne Taylor, UNITED STATES ATTORNEY'S OFFICE, Greeneville, Tennessee, for Appellee.

MERRITT, J., delivered the opinion of the court in which, DONALD, J., joined. CLAY, J. (pp. 13–19), delivered a separate dissenting opinion.

_____

## OPINION

_____

MERRITT, Circuit Judge.  Defendant Abel Martinez Tavera was convicted by a jury and sentenced to 186 months of imprisonment for participating in a methamphetamine drug conspiracy.  With Tavera as his passenger, co-defendant Placido

1

Mendoza drove a truck for several hours from North Carolina to Tennessee. The truck contained construction equipment and a large quantity of methamphetamine hidden under nails. The police arrested both men after discovering the drugs. At his trial, Tavera, a roofer, testified that he did not know about the drugs and that he thought he was going to Tennessee to view a construction project. After his conviction, Tavera learned that a few days before his trial Mendoza had participated in plea negotiations in which he told Assistant U.S. Attorney Donald Taylor, the government's trial lawyer in Tavera's case, that Tavera had no knowledge of the drug conspiracy. Mendoza pled guilty after the negotiations.

Mendoza's statements to Taylor were plainly exculpatory. They not only corroborated Tavera's trial testimony—they directly contradicted the story of the government's main witness, co-defendant Guadalupe Granado, who testified that Tavera had detailed knowledge of the drugs in the truck and participated in the conspiracy. However, the jury never learned of Mendoza's statements because Taylor, the prosecutor, failed to disclose them to Tavera. Tavera was in jail. He did not communicate with or presumably did not have access to Mendoza. His lawyer did not interview Mendoza.

Fifty years ago, the Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963), that the government must provide defendants with material, exculpatory evidence in its possession. Failure to do so results in a trial that is fundamentally unfair. The Supreme Court has never wavered from this principle. Yet nondisclosure of *Brady* material is still a perennial problem, as multiple scholarly accounts attest.[1] This case shows once again how prosecutors substitute their own judgment of the defendant's guilt for that of the jury. So long as favorable evidence could very well affect the jury's

---

[1] *See, e.g.*, Stephanos Bibas, *Prosecutorial Regulation Versus Prosecutorial Accountability*, 157 U. Pa. L. Rev. 959, 975–77 (2009) (concluding that prosecutors rarely receive professional discipline despite a high number of *Brady* violations); Bennett L. Gershman, *Litigating* Brady v. Maryland: *Games Prosecutors Play*, 57 Case W. Res. L. Rev. 531 (2007) (documenting strategies prosecutors use to avoid disclosing favorable evidence); James S. Liebman et al., *Capital Attrition: Error Rates in Capital Cases, 1973–1995*, 78 Tex. L. Rev. 1839, 1850 (2000) (reporting that *Brady* violations caused sixteen percent of capital-case reversals in state postconviction proceedings during period studied).

decision, prosecutors *must* disclose it.  And when they fail to do so, courts have a duty to order a retrial, allowing a jury to consider the previously concealed evidence.

This particular case is not close.  Prosecutor Taylor's failure to disclose Mendoza's statements resulted in a due process violation.  We therefore vacate Tavera's conviction and remand for a new trial.  In addition, we recommend that the U.S. Attorney's office for the Eastern District of Tennessee conduct an investigation of why this prosecutorial error occurred and make sure that such *Brady* violations do not continue.

## I.  Background

In May 2010, Tavera was arrested with four co-defendants during an undercover sting in the area of Morristown, Tennessee.  The sting was the product of an investigation in which Agent Michael Templeton of the Drug Enforcement Administration posed as a dealer interested in acquiring a large quantity of marijuana or methamphetamine.  Agent Templeton's main contact was Guadalupe Granado. Templeton bought small quantities of meth from Granado on several occasions and arranged to purchase ten pounds of the drug on May 14, 2010.  Originally the plan was for Templeton to conduct the transaction in a McDonald's parking lot with unknown associates of Granado.  This arrangement fell through at the last minute because Granado insisted that the meeting be changed to a more remote location.  However, surveillance enabled law enforcement to track and arrest the participants as they were driving away from the planned location of the buy.

Police first arrested Elias Perez, Placido Mendoza, and Tavera.  Perez was driving a red Chevy Cavalier.  A search of the car uncovered a firearm and ammunition inside a cooler.  Mendoza was driving a red Dodge Ram pickup truck in which Tavera was the passenger.  The truck contained a variety of construction equipment, including a ladder and a bucket of nails.  Underneath the nails police discovered a large quantity of methamphetamine.  As it later emerged, Mendoza and Tavera had driven with the drugs from Winston-Salem, North Carolina, that same day.  Perez, who had been staying

in Tennessee, had been assigned to drive the Cavalier as a lookout. Later in the day police arrested Granado and Marco Rivera, who turned out to be the source of the drugs.

The government indicted all five men. It charged Tavera with one count of conspiracy to distribute over 500 grams of methamphetamine and one count of possession with intent to distribute over 500 grams of methamphetamine.[2] All participants except Tavera pled guilty.

Tavera's trial was held on May 3–6, 2011. Granado's testimony was the primary proof against Tavera. Granado testified that he had previously been to Tavera's home in North Carolina and that Tavera was present while Rivera cooked meth. He testified to overhearing a phone conversation between Rivera and Mendoza in which Rivera suggested that Mendoza bring Tavera for security and to count money from the transaction. He testified that Tavera was to be paid for helping with the drugs and that there was no construction job. And he testified to post-arrest conversations he had with Tavera in jail. In these conversations, Tavera stated that he wished to remove meth-related materials from his home, asked Granado to tell law enforcement that he had never seen Tavera before, and revealed that he had used the ladder to make it look like he and Mendoza were traveling for construction work.

In addition to Granado's testimony, the government introduced physical evidence recovered from the truck and evidence of phone calls exchanged between the participants in the hours before the arrest. There were multiple calls from Rivera to Mendoza, but not Tavera, during the time that Mendoza and Tavera were driving from North Carolina. Additionally, Tavera had talked on the phone with both Rivera and Mendoza in the weeks before the sting.

Tavera's primary proof was his own testimony. He testified, contrary to Granado's story, that he and Granado had never met before the sting and that he never attempted to get Granado to lie. He established his long career as a roofer and stated that

---

[2] The government also charged Tavera with aiding and abetting possession of the firearm found in the Cavalier driven by Perez. The jury found Tavera guilty of the charge, but the district court granted Tavera's subsequent motion for judgment of acquittal. This charge is not at issue here.

he knew Mendoza and Rivera through legitimate construction work.  He testified that he believed the purpose of the trip was to provide an estimate on a roofing job and that he brought the ladder for that reason.  When he and Mendoza arrived at the site of the drug transaction, Tavera said, he began to get "desperate about where the job was going to be," and Mendoza responded that they were waiting for someone to take them there.  On cross-examination, Tavera said he did not know the exact location of the job beforehand.  He also admitted that Mendoza talked with Rivera on the phone during the trip, but he contended that he did not hear the substance of the conversations.  In addition to this evidence, the parties stipulated that ion swabs showed methamphetamine on Mendoza's hands and cell phone, on the cooler where the firearm was found, and in Granado's car, but not on Tavera's hands or cell phone.

The jury found Tavera guilty on all counts, and on September 12, 2011, the court sentenced him to 15 years and 6 months of imprisonment. The court held a sentencing hearing for Mendoza on the same day.  At his hearing, Mendoza argued that he was "safety-valve" eligible for a reduced sentence because he had provided truthful information to the government about the crime.  In the week before Tavera's trial, Mendoza had participated in two debriefings with Mr. Taylor, the Assistant U.S. Attorney, and agents involved in the sting.  At the first debriefing, Mendoza told Taylor and the agents that Tavera was not involved in the conspiracy and did not know there were drugs in the truck.  Later the same day, there was a second debriefing at which Mendoza said Tavera "did know about the drugs that were in the vehicle, but did not know until he got in the vehicle with [Mendoza] that day." R. 213, Mendoza Sentencing Tr. at 15.  Throughout these debriefings, Mendoza denied that the defendant came along to count money or provide security.  He consistently maintained that the roofing job was one of the purposes of the trip to Tennessee.

The government never disclosed Mendoza's statements to Tavera.  After the debriefings, Mendoza signed a plea agreement.  Mendoza's agreement reversed his position that Tavera was innocent and stated, "Tavera knew that they were transporting methamphetamine from North Carolina to be delivered to another person in Tennessee

and agreed to accompany [Mendoza]. Since they were transporting methamphetamine, Tavera told [Mendoza] that they needed to be careful." R. 143, Am. Plea Agreement at 6. Obviously, Mendoza was lying either in the beginning or after his plea negotiations.

Tavera filed a timely notice of appeal from the district court's final judgment, thus vesting this court with jurisdiction. One year later, Tavera filed his brief in this court as well as a motion for a new trial in the district court. Both are based on the argument that *Brady* required disclosure of Mendoza's statements at the debriefings. The district court has not yet ruled on the new-trial motion. Ordinarily we would provide the district court an opportunity to consider the motion before we do. However, because *Brady* claims ultimately present a question of law reviewed *de novo*, *see United States v. Tarwater*, 308 F.3d 494, 515 (6th Cir. 2002), and because Tavera and the government agree that the factual record is fully developed, we proceed to decide the issue.

## II. *Brady*

Fundamental guarantees of due process require the government to provide defendants with evidence it possesses that is exculpatory and material to the defense. This has been a cardinal rule of criminal procedure since *Brady v. Maryland*, 373 U.S. 83 (1963). Under contemporary doctrine, there is a *Brady* violation, and a new trial is warranted, if three conditions are met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, *either willfully or inadvertently*; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (emphasis added). *Brady* itself was a case like this one in which the prosecution failed to disclose a statement by a co-defendant that Brady did not shoot the victim. Apparently, neither Brady nor his counsel had attempted to interview the witness. Here, we must consider

whether the government suppressed Mendoza's statements and, if so, whether those statements were material to Tavera's defense so that the suppression prejudiced him.[3]

## A.  Suppression

In defense of its failure to disclose Mendoza's statements, the government argues, and the dissent agrees, that Tavera (although confined to his prison cell) or his lawyer should have exercised "due diligence" and discovered the statements by asking Mendoza if he had talked to the prosecutor.  This "due diligence" defense places the burden of discovering exculpatory information on the defendant and releases the prosecutor from the duty of disclosure.  It relieves the government of its *Brady* obligations.  In its latest case on the issue, however, the Supreme Court rebuked the Court of Appeals for relying on such a due diligence requirement to undermine the *Brady* rule.

In *Banks v. Dretke*, 540 U.S. 668 (2004), the Court considered the Fifth Circuit's use of a due-diligence requirement to dismiss the defendant's *Brady* claim.  As in this case, the diligence question in *Banks* was whether the defendant "should have asked to interview" a witness who could have furnished the exculpatory evidence the prosecutor did not disclose.  *Banks*, 540 U.S. at 688.  The Supreme Court rejected this requirement in no uncertain terms at page 696:

> The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence," Tr. of Oral Arg. 35, so long as the "potential existence" of a prosecutorial misconduct claim might have been detected, *id.*, at 36.  A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.  "Ordinarily, we presume that public officials have properly discharged their official duties."  *Bracy v. Gramley*, 520 U.S. 899, 909

---

[3] The government insists that Mendoza's statements are "at best, equally inculpatory and exculpatory."  Br. of the United States at 32.  We cannot take this argument seriously.  As we discuss in Part II.B below, the government must show more than the defendant's mere knowledge to establish liability for conspiracy or possession with intent to distribute.  Mendoza may have changed his story, but he was consistent in saying to Taylor and the agents at the interviews that Tavera did not know there were drugs in the truck *before he agreed to accompany Mendoza* and that Tavera did not ride along to provide security.  This information, if believed, exculpates Tavera by showing his lack of willing involvement in the conspiracy or intent to distribute drugs.

(1997) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926) (internal quotation marks omitted)). We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S., at 281; accord *Kyles*, 514 U.S., at 439–440; *United States v. Bagley*, 473 U.S. 667, 675, n. 6 (1985); *Berger*, 295 U.S., at 88. See also *Olmstead v. United States*, 277 U.S. 438, 484 (1928) (Brandeis, J., dissenting). Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." *Berger*, 295 U.S., at 88. Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation.

(Emphasis added). Prior to *Banks*, some courts, including the Sixth Circuit, as our dissenting colleague argues, were avoiding the *Brady* rule and favoring the prosecution with a broad defendant-due-diligence rule. But the clear holding in *Banks* should have ended that practice.[4]

The Supreme Court's rejection of the idea that the "prisoner still has the burden to discover the evidence" is based in part on the fact that the prosecution has the advantage of a large staff of investigators, prosecutors and grand jurors, as well as new technology such as wiretaps of cell phones. That is one of the reasons that these investigators must assist the defendant who normally lacks this assistance and may wrongfully lose his liberty for years if the information they uncover remains undisclosed. The superior prosecutorial investigatory apparatus must turn over exculpatory information. The *Brady* rule imposes an independent duty to act on the government, like the duty to notify the defendant of the charges against him.

The prosecutor and our dissenting colleague would fault Tavera's lawyer for not finding out that Mendoza had at first told the prosecutor that Tavera was innocent before later changing his story in plea negotiations. But if the lawyer lost the benefit of *Brady* by his failure to "seek" (as the Supreme Court describes it in *Banks*), the lawyer most

---

[4]Our dissenting colleague argues that the Sixth Circuit has adopted the due diligence defense as a "gloss" but that we must apply it here anyway despite the Supreme Court's opinion to the contrary in *Banks*. In *Bell v. Bell*, 512 F.3d 223, 235 (6th Cir. 2008), the *en banc* court distinguished *Banks* on the ground that *Bell* involved "public sentencing records" rather than "information known to investigating officers that defendants had no reason to know about" — the situation in Tavera's case. The instant case is not a "public records" case.

certainly then would have been guilty of ineffective assistance of counsel. According to the prosecution here, as the government argued in *Banks*, it was the lawyer's responsibility to "discover this evidence." If the prosecution and the dissent are right, we must punish the client who is in jail for his lawyer's failure to carry out a duty no one knew the lawyer had. The *Banks* case makes it clear that the client does not lose the benefit of *Brady* when the lawyer fails to "detect" the favorable information.

Even with a broad diligence rule, it seems highly unlikely in this case that an adverse co-defendant like Mendoza, if interviewed, would have disclosed to Tavera that he had at first told the prosecutor that Tavera was innocent but changed his story during his plea negotiations. Mendoza's lawyer would have told him that he would be admitting to a federal crime by admitting that he had lied to government agents either before or after the plea agreement. *See* 18 U.S.C. § 1001.

It is not unusual for prosecutors to receive exculpatory statements the defendant does not know about. This is the type of information *Brady* was designed to force into the open. *See both Brady* and *Strickler*, 527 U.S. at 282–89 (rejecting due diligence argument where government failed to disclose prior statement inconsistent with witness's trial testimony).

In sum, we follow the Supreme Court in *Brady*, *Strickler*, and the recent *Banks* case, and decline to adopt the due diligence rule that the government proposes based on earlier, erroneous cases.

## B.  Materiality

To determine whether nondisclosure of exculpatory evidence resulted in an unfair trial, we assess whether the evidence was "material" to a defendant's case. Evidence is material under *Brady* if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" is defined as "probability sufficient to undermine confidence in the outcome." *Id.* The court must review the trial record and decide whether it remains confident that the

outcome would be the same even if the jury heard the suppressed evidence. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). If consideration of the additional evidence shakes the court's confidence in the verdict, a new trial should be ordered even if there remains sufficient evidence to sustain a conviction. *See Strickler*, 527 U.S. at 290 ("[T]he materiality inquiry is not just a matter of determining whether . . . the remaining evidence is sufficient to support the jury's conclusions."); *United States v. Agurs*, 427 U.S. 97, 112 (1976) ("[T]he omission must be evaluated in the context of the entire record.").

Here, Tavera was convicted of conspiracy to distribute the methamphetamine as well as possessing it with intent to distribute. Liability for each crime requires a showing of intent. To establish conspiracy, the government must prove that the defendant knew the "essential object of the conspiracy" and that he was "a party to the general conspiratorial agreement." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986). Where drugs are involved, the government must show "an agreement to violate drug laws," "intent to join the conspiracy," and "participation in the conspiracy." *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010). As for possession with intent to distribute, physical presence at the place where drugs are found is insufficient proof. The defendant must have "ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991). Additionally, the government must show "intent [to distribute], as opposed to mere knowledge." *Id.* at 590.

Having reviewed the trial record, we cannot be confident that the jury would have found these elements satisfied had it known of Mendoza's statements. The government's proof of Tavera's intent to join the conspiracy and distribute the drugs was not overwhelming. The only direct evidence of intent was Granado's testimony. This was problematic proof, to say the least. Granado had serious credibility issues, given his established history as a drug dealer and his personal incentive to help the

prosecution. Of course, problematic evidence is not necessarily insufficient evidence, but sufficiency is not the question that *Brady* requires us to address. Had Tavera been able to bolster his own testimony with Mendoza's statements, he would have added a significant amount of weight to his side of the scale. Mendoza was a felon, but, considering the circumstances in which his statements were given, a juror may have believed he was telling the truth at first rather than after he had negotiated a guilty plea with the government. When the suppressed evidence tends to prove that the defendant did not willingly assist in a drug deal, and when the only evidence showing otherwise is the testimony of an indicted co-defendant, we cannot say with any confidence that the outcome of the trial would have been the same.

The government offers several reasons why Mendoza's statements would not have changed the outcome of the trial. First, it asserts that Mendoza's statements were both internally inconsistent (because Mendoza changed his story between the first and second debriefings) and inconsistent with Tavera's trial testimony (because Tavera testified that they were traveling to "estimate" a roofing job and Mendoza told the government that they were traveling to "do" a roofing job). These discrepancies do not give us pause. While Mendoza indeed changed his story, he maintained that Tavera knew of no drugs before getting in the truck and had no role in providing security. And the distinction between estimating a roofing job and actually performing it is insignificant. Both men stated that they intended to do legitimate work in Tennessee.

Second, the government argues that other evidence corroborates Tavera's guilt. This evidence includes Tavera's own "largely incredible" testimony (namely his contention that he didn't know the exact location of the roofing job and that he couldn't hear Mendoza's phone conversations in the truck); wiretaps in which Granado referred to "his people" in North Carolina (where Tavera lived); the fact that Granado previously used the truck in which Tavera was arrested to conduct a drug transaction with Agent Templeton; and phone records, including Tavera's previous calls with Mendoza and Rivera. However, none of this evidence goes to the ultimate issue of the defendant's intent. The best proof—the phone calls—can be explained by Tavera's testimony that

he knew Mendoza and Rivera through legitimate activity. Moreover, the government fails to acknowledge other proof in Tavera's favor, namely, unlike Mendoza, he lacked methamphetamine traces on his hands and cell phone.

Finally, the government argues that Mendoza's statements would have been impeached and disproved had Tavera introduced them. Specifically, the government could introduce a letter in the record in which Mendoza tried to convince Rivera to lie about the crime, as well as Mendoza's plea agreement stipulating that Tavera "knew that they were transporting methamphetamine from North Carolina to be delivered to another person in Tennessee and agreed to accompany [Mendoza]." Though the latter piece of evidence is unfavorable to Tavera, it does not trump the statements that Mendoza provided at the debriefings. If faced with both Mendoza's plea agreement and his statements to the government, a jury would have to determine which evidence deserves more weight in light of the "reasonable doubt" standard. We cannot be confident how they would have assessed either piece of evidence in light of the entire record. The government has no reasonable justification for withholding the Mendoza statements. We do not want other prosecutors to imitate the prosecutor's conduct in this case. *Brady* and *Banks* do not require the defendant to discover such undisclosed statements laying in the prosecutor's file.

Accordingly, the judgment of the district court is vacated and the case is remanded for further proceedings.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  Defendant Abel Martinez Tavera and his co-defendant Placido Ventura Mendoza were together during the commission of the crime for which Defendant was convicted.  Other than Defendant himself, Mendoza was the only witness who could have corroborated Defendant's version of events, and Defendant admits that he knew as much.  But Defendant never attempted to contact Mendoza, interview him, or call him as a defense witness.  Binding precedent in this Circuit holds that, under these circumstances, the government does not violate *Brady v. Maryland*, 373 U.S. 83 (1963), if it fails to disclose a statement made by a non-testifying witness such as Mendoza.  *See Benge v. Johnson*, 474 F.3d 236, 244 (6th Cir. 2007); *United States v. Corrado*, 227 F.3d 528, 538 (6th Cir. 2000); *United States v. Mullins*, 22 F.3d 1365, 1371–72 (6th Cir. 1994); *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990).  Although this rule may be misguided, as the majority insists that it is, I can find no meaningful way to distinguish these precedents.  Because these prior holdings are binding on this panel, I would affirm Defendant's conviction.

The majority seems to acknowledge the precedential nature of these Sixth Circuit cases, *see* Maj. Op. at 8, but rather than apply them, argues that they were essentially overruled by the Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004).  However, *Banks* does not purport to upset the rule announced in our Circuit's cases, nor has any court ever held that it did so.  Rather, *Banks* stands for the uncontroversial proposition that a prosecutor cannot lead a defendant to believe that he possesses all relevant information when, in fact, he is mistaken about significant details that only the government knows.  *See id.* at 693–96.  I have favored applying the principle in *Banks* whenever a prosecutor falsely represents that all favorable information has been disclosed because, in those situations, the defendant is effectively prevented from investigating on his own.  *See Bell v. Bell*, 512 F.3d 223, 241–42 (6th Cir. 2008) (Clay, J., dissenting).  This case presents quite a different situation.  The government in this

case made no representations to Defendant, and none of the government's conduct could have led Defendant to believe that everything in its files had been disclosed.  Under these circumstances, our precedents tell us that *Brady* is not violated.

If we were writing on a blank slate or applying *Brady* without considering the subsequent controlling case law of the Sixth Circuit, the majority's holding might well be sustainable.  However, *Brady* is not the only star in the constellation of cases that we are obliged to consider and faithfully apply.  Even if many of the controlling cases are unwise or ill-conceived in light of the fairness concerns that underpin *Brady*, we are no less bound to adhere to them.  A prior published panel decision "remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009).  Furthermore, "[i]n the Sixth Circuit, as well as all other federal circuits, one panel cannot overrule a prior panel's published decision." *United States v. Washington*, 127 F.3d 510, 517 (6th Cir. 1997).

In *Brady* itself, the state prosecutor, in response to a specific request for information, misled the defendant by disclosing some of his co-defendant's pretrial statements while withholding the co-defendant's confession to the murder for which the defendant was ultimately convicted. *Brady*, 363 U.S. at 84–87.  The Supreme Court held that the prosecutor's suppression of the evidence violated the defendant's due process rights. *Id.* at 87.  The Court later held, in *United States v. Agurs*, 427 U.S. 97 (1976), that some evidence otherwise "unknown to defense counsel" must be disclosed to the defendant when no request has been made, but it limited that holding to evidence "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *Id.* at 110.

The courts of appeals, including the Sixth Circuit, have attached an additional gloss to the *Brady* rule.  "'[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source.'" *Jones v.*

*Bagley*, 696 F.3d 475, 487 (6th Cir. 2012) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)); *see also Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008) (holding that the failure to disclose evidence known to the defense "cannot form the basis of a *Brady* violation"). To be entitled to a new trial under *Brady*, the defendant must show that the suppressed exculpatory evidence "could not have been discovered earlier with due diligence." *Corrado*, 227 F.3d at 538.

Rightly or wrongly, this Court has applied this diligence requirement in circumstances like those present in this case: where a defendant knows of the existence and relevance of a non-testifying witness but fails to contact either the witness or the government. In *Benge v. Johnson*, a habeas case, a state defendant charged with murder argued that the state had violated *Brady* by failing to turn over potentially exculpatory statements made to a grand jury by a witness who was never called by the state to testify at trial. *Benge*, 474 F.3d at 243. This Court disagreed, finding that because the defendant and the witness were together for the relevant time period, the defendant knew all the information that could have led him to the witness on his own. *Id.* *Benge* is largely indistinguishable from this case. In this case, Mendoza, a non-testifying witness, made potentially exculpatory statements to the government. Although Defendant did not know of the statements themselves, he admits that he "was obviously aware of the substance of Mendoza's statements" because they were together during the commission of the crime. (Appellant's Reply Br. 2.) But Defendant made no inquiries of either Mendoza or the government.

Similarly, in *United States v. Corrado*, this Court held that the government was not required to disclose statements made by non-testifying witnesses when the defendant "made no showing that he would have been unable to identify, locate, and interview these individuals through reasonable efforts on his own part." *Corrado*, 227 F.3d at 538; *accord Mullins*, 22 F.3d at 1371–72 (finding no *Brady* violation when the government did not disclose a witness's statement because the defendant was aware of the content of the statement); *Todd*, 920 F.2d at 405 (finding no *Brady* violation where the defendant was aware that witnesses might have had exculpatory information). Like the majority,

I question the wisdom of imposing such investigatory burdens on criminal defendants, but the import of these cases is nonetheless clear:  a defendant who knows that a witness possesses potentially exculpatory information must attempt to take advantage of that knowledge.

Other circuits have similarly held that *Brady* is not implicated when a defendant is aware of a witness's potentially exculpatory knowledge but fails to take any steps to interview the witness or obtain any of their prior statements.  *See United States v. Bond*, 552 F.3d 1092, 1096 (9th Cir. 2009) ("[W]here a witness is involved the government is not required to make his statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony he might furnish." (internal quotation marks and alterations omitted)); *Pondexter v. Quarterman*, 537 F.3d 511, 526 (5th Cir. 2008); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002); *Wright v. Hopper*, 169 F.3d 695, 702 (11th Cir. 1999); *United States v. Lockhart*, 956 F.2d 1418, 1425–26 (7th Cir. 1992); *United States v. Hicks*, 848 F.2d 1, 3–4 (1st Cir. 1988); *United States v. LeRoy*, 687 F.2d 610, 618–19 (2d Cir. 1982); *see also Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) ("*Brady* obviously does not apply to information that is not wholly within the control of the prosecution.")

I agree with the majority that, in many cases, the rule imposed by our precedents will place an unfair burden on defendants to conduct their own investigations and relieve prosecutors of the disclosure obligations that *Brady* may have originally envisioned.  But we must apply the law as it is, not as we wish it were.  The Supreme Court has repeatedly told us that even though a broad criminal discovery regime "might be desirable, the Constitution surely does not demand that much." *Agurs*, 427 U.S. at 109; *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case.").  The law as it stands does not support the result reached by the majority in this case.

The majority goes on to find that even if Mendoza had been approached by Defendant, Mendoza was unlikely to have talked to him, much less testified on his

behalf.  The majority further contends that had he been subpoenaed to testify, Mendoza likely would have invoked his right against self-incrimination.  Therefore, the argument goes, Mendoza's statements were *de facto* unavailable, and the government was required by *Brady* to disclose them.  This argument appears altogether reasonable, and it is an approach I would favor if asked to decide the issue without being circumscribed by existing legal precedent.  A key promise of *Brady* is to remedy the persistent imbalance in resources and access that favors the prosecution over the defense, and for the courts to perpetuate that imbalance—whether directly caused by the government or not—seems to abdicate *Brady*'s promise.

However, this sensible argument is once again contradicted by binding precedent. In *Benge*, the witness with potentially exculpatory information simply refused to speak with the defendant's attorney.  *Benge*, 474 F.3d at 244.  This Court held that under such circumstances, the government does not violate *Brady* by not disclosing the witness's prior statements.  *Id.*  The witness's "refusal to speak with counsel for [the defendant] did not result from any action by the state . . . .  No matter how unfortunate for [the defendant], this was simply not the prosecutor's doing."  *Id.*; *see also United States v. Cheatham*, 899 F.2d 747, 753 (8th Cir. 1990) ("No constitutional violation occurs when a witness chooses of her own volition not to be interviewed by the defense.").

In *Mullins*, a non-testifying witness had been interviewed by the FBI, and the government admitted that it possessed a summary of that interview which it did not disclose to the defendant. *Mullins*, 22 F.3d at 1371.  The defendant knew that the witness may have been able to contradict some of the government's evidence, and he asked the witness if he would testify.  The witness told the defendant that he would not voluntarily testify, and if subpoenaed, would assert his Fifth Amendment rights.  *Id.* at 1371 n.2. Even though the witness was practically inaccessible to the defendant, this Court found that the government had not violated *Brady* by failing to disclose the witness's prior statement because the substance of the witness's knowledge was known to the defendant. *Id.* at 1372.  Under *Benge* and *Mullins*, the reason that a witness refuses to speak with the defendant thus appears irrelevant.  Unless the witness's unavailability is somehow

caused by or attributable to the government, *Brady* is not implicated because evidence has not been "suppressed."   This rule seems quite ill-conceived, but it binds us nonetheless.

When a defendant knows of the existence of a witness with potentially exculpatory information, our cases appear to require some act of "suppression" by the government.  A defendant's reasonable reliance on an "open file" policy, for example, would suffice to establish government suppression because it would constitute a representation by the government that all favorable information had been disclosed.  *See Strickler v. Greene*, 527 U.S. 263, 283–85 (1999).  Similarly, the government cannot lead a defendant to believe that he possesses all relevant information when, in fact, he is mistaken about significant details like whether a government witness was a police informant.  *See Banks*, 540 U.S. at 693–94 ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").  Had Defendant taken any steps to pursue the information he admittedly possessed about Mendoza's identity and his potentially exculpatory knowledge, the government would have been required to respond truthfully.  Because Defendant did nothing, our precedents in *Benge* and *Mullins* absolve the government of responsibility.

Had the government concealed evidence after a specific request or falsely represented that it had disclosed all favorable evidence, a new trial would be warranted without question.  In the absence of contrary controlling case law, I would favor an extension of these principles to this very case.  Prosecutors should be obliged to turn over evidence in their possession that is practically unavailable to the defendant, even if the government did not cause the evidence to be unavailable.  Such a rule is consistent with *Brady*'s "overarching concern that the defendant receives a fair trial" and the Supreme Court's consistent attempts to discourage prosecutors from engaging in "unsavory gamesmanship" when the defendant's liberty is at stake.  *See Bell*, 512 F.3d at 240, 244 (Clay, J., dissenting).  Nevertheless, it is up to this Court sitting en banc or

the Supreme Court, not this panel, to decide whether the applicable Sixth Circuit case law has unduly strayed from the Supreme Court's holding in *Brady*.

*Brady*'s disclosure requirement is undoubtedly among the bedrock principles of our criminal justice system.  Although subsequent cases have not adequately respected *Brady*'s commitment to fundamental fairness, these cases control our decision. Notwithstanding the majority's view of what *Brady* should have required in this case, our controlling precedents tell us that the evidence in question was not "unavailable" within the meaning of *Brady* because Defendant was aware of Mendoza's potentially exculpatory knowledge but failed to take any steps to interview him or obtain any of his prior statements.  Recognizing that we are bound by this case law, we are required to affirm Defendant's conviction and sentence.  Therefore, I respectfully dissent from the Court's judgment.