### PEOPLE v. PURMAN.

1. CRIMINAL LAW—WITNESSES—EVIDENCE—CROSS-EXAMINATION — CORROBORATION.

In a prosecution for receiving a stolen automobile, the trial court was not in error in permitting a witness for the people, after a searching cross-examination assailing her testimony given upon the preliminary examination, to be re-examined by the prosecutor in regard thereto for the purpose of corroboration.

2. NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

The motion for a new trial upon the ground of newly-discovered evidence was properly denied where everything stated in the affidavit in support thereof might be true and yet defendant be guilty of the crime of which he was convicted.

3. SAME.

> A new trial will not be granted because of newly-dis-
> covered evidence where the witness who was to give
> it was known to the accused, although he could not be
> found at the time of the trial, where no continuance or
> postponement was requested.

Error to recorder's court of Detroit; Heston (Wil-
liam M.), J.    Submitted October 13, 1921.    (Docket
No. 179.)    Decided December 21, 1921.

Walter Purman was convicted of receiving a stolen
automobile, and sentenced to imprisonment for not
less than 2 nor more than 5 years in the Detroit
house of correction.    Affirmed.

*Scott & Hurley* and *O. Z. Ide,* for appellant.

*Merlin Wiley,* Attorney General, *Paul W. Voorhies,*
Prosecuting Attorney, *Edwin S. Bartlett* and *Harry S.
Toy,* Assistants Prosecuting Attorney, for the people.

STONE, J.    Defendant was convicted in the re-
corder's court of the city of Detroit of the crime of
receiving a stolen automobile of the value of $1,000
on July 17, 1919, he "then and there well knowing the
said goods and chattels to have been feloniously
stolen," etc.    The information also contained a count
for larceny.    There were two trials.    On the first
trial, which occurred on November 16, 1920, the jury
disagreed.    The second trial took place on January 7
and 8, 1921.    Sentence was pronounced upon the con-
viction, and the case is here upon writ of error.    There
was evidence to the effect that on July 17, 1919, one
James O. Barthol parked his Dort touring car in the
city of Detroit about 7 o'clock a. m., and that upon re-
turning to where he had parked it about 9 o'clock a. m.
the automobile was gone; that the defendant occupied
a garage on Sibley street and that at about 9:30 a.
m. that day he was seen, by a witness, driving a car,

bearing the same license number as was borne by Barthol's car, into his garage on Sibley street, and was shortly thereafter seen emerging therefrom with a package under his arm, claimed to contain license plates; that the defendant was painting the car when, on the following Sunday (July 20th), two officers came to the garage and found a coat hanging over the window, and the doors shut; that while they were standing there the defendant came out of the garage and jumped over the fence and went into a coal shed near by and hid, and that one of the officers pursued him and arrested him. It appeared that at this time there were no license plates on the car, and that the factory serial number, the number on the flywheel, and the motor number corresponded to those on Mr. Barthol's car except that the first figure of the motor number had been changed. The car was identified as Mr. Barthol's and the officers took possession of it. There was evidence that on the day the car was stolen it was in its original color, being that of a very dark green; that Barthol had bought the car new about two months prior thereto, paying $1,000 for it; that he had bumpers on the front and rear of his car, which bumpers had been taken off his car when it was recovered. The bumpers were found in the possession of one William Fisher, a brother of the persons with whom defendant was living, the defendant claiming that he had carried the bumpers to Fisher, after having bought them from a man by the name of Derondo. The defendant testified that on the day the car was stolen, and about 10 o'clock in the morning, the car in question was brought to his garage by a man named Derondo, to be painted, that defendant had seen this man before on three or four occasions about the corner of Park and Henry streets, and that when he left the garage he took the license plates of the car with him saying that he

wanted to use them on another car while he was having the car painted. Defendant testified that the man Derondo gave his address as 120 Montcalm street, but it turned out that no such person lived at that number.

Upon the trial the testimony of the witness Eva Hollinger became important, and we quote from it as follows:

"On the 17th day of July, 1919 I lived at 77 Sproat street, Detroit. I was at home on the morning of the 17th of July and saw this defendant drive a car into the garage in the rear of 78 Sibley street. My home is located just across the alley. * * * It was about 9:30 in the morning that I saw this defendant drive a car in, as he was in there quite a little while, and the clock in the fire department struck 10, just after he left the garage. I saw him come out again after driving the car in there. This all occurred on the 17th of July. The car the defendant drove in was different from the cars he had been driving in and out of there before; it was apparently very new and different in color. The license number was 80,526."

This was the license number of Mr. Barthol's car. She testified that on Sunday following, being the day of the arrest of defendant, she saw the car and that it had been repainted a light green. This witness was subjected to a rigid cross-examination covering more than 12 pages of the printed record, mostly relating to the license number. She testified that her suspicions were aroused and that she wrote down the license number at the time. In the course of her cross-examination she testified as follows:

"I saw the license plates as the car went into the garage. I took the license number down. I don't know what I did with the number after I notified the officers about it. We notified the officers that evening, first, Thursday evening, the officer on that beat. The last time I saw the paper on which I marked the license was the first time I was in court, just before I came

to court, the police court.   I can't say that I remembered it ever since because after that the case had gone for probably a year or more.   Then I asked Mr. Grimm; I told him I had forgotten that license number.

"*Q.* So your testimony now as to the license number that you saw on that machine, is based not on your memory of it on July 17, but on your memory refreshed by talking to Mr. Grimm?

"*A.* Yes, sir.

"*Q.* You don't mean to tell the jury you remembered those five numbers on that license plate from July 17, without any assistance from anything?·

"*A.* Well, I could if I had paid any attention.

"*Q.* So your memory has been refreshed by talking to Mr. Grimm as to what the license number that you saw was?

"*A.* Yes, sir, because I thought that when I had told the officers about it, why, that was enough, and I didn't try to remember any.

"*Q.* Then if you had not talked to Mr. Grimm about this license number since the time that you saw it on July 17, you wouldn't be able to testify?

"*A.* No, sir.

"*Q.* Then Mrs. Hollinger, if you hadn't talked to anybody at all about this case since you first came to the police court, and I asked you what the numbers were on the license plate which was on the car that you say you saw Mr. Purman drive in on July 17, you would have answered that you didn't know, wouldn't you?

"*A.* Yes, sir.

"*Q.* At the time you testified in this case before, Mrs. Hollinger, on November 16, 1920, you were asked this question:   'What made you do that,' and you answered:   'Well, the way he acted, I felt very suspicious.'   Do you recall that?

"*A.* Yes, sir.

"*Q.* How did he act, Mrs. Hollinger, that made you suspicious?   Just tell the court.

"*A.* In the first place he used to drive the machine right to the door, every day, and this day he stopped back of the house where I could see the machine, and then he seemed in a great hurry when he went to open the doors, and also when he closed them, and also

when he came out of the garage he looked back, and he acted suspicious."

Upon re-cross-examination this witness testified that she had the paper upon which she wrote the number at the time of the preliminary examination in her possession, but did not have it in court, although she saw it that day. She was further interrogated as to her testimony relating to the license number, upon the first trial in the recorder's court. The following occurred upon her re-examination:

"*Assistant Prosecuting Attorney.* Now, you did have the benefit or reference to that memorandum just before you testified in the examination, didn't you?

"*A.* Yes, sir, I did.

"*Q.* You did testify in the original examination?

"*A.* Yes, sir.

"*Q.* I will ask you whether or not in that examination—

"*Defendant's Attorney.* I object to the use of the preliminary examination to reinforce or help out this witness.

"*The Court:* To reinforce her, or help her out?

"*Defendant's Attorney.* Yes, I don't think it can be used for that purpose.

"*The Court:* You may have your exception. It isn't for the purpose of impeachment.

"*Assistant Prosecuting Attorney.* You raised the question, you have brought out the fact that she referred to this memo. before she testified on the original examination.

"*Defendant's Attorney.* I know, but I didn't use those notes, and I don't think the notes of the preliminary examination are admissible except for the purpose of impeachment. I don't think that the prosecution can use those notes taken, to reinforce the testimony of his own witness.

"*The Court:* You may have your exception.

"*Q.* At this time, was this question asked you: '*Q.* Do you know whether or not it was the car that belonged to the complaining witness, Mr. Barthol?' And did you make the answer: '*A.* Yes, sir, it was the same number?'

"*A*. I think I made that answer, it was the same number.    I didn't know then it was Mr. Barthol's car, though. .

"*Q*. Was this question asked you:    '*Q*. The same number?'    And did you make the answer:    '*A*. Bearing the same license number as his car?'    *    *    *

"*A*. Yes, sir."

There was a motion for a new trial on the ground of newly-discovered evidence, on January 15, 1921. It was denied on January 19, 1921, and no exceptions were filed.

On March 8, 1921, a motion was made to set aside the order denying a new trial, and to grant a new trial on amended motion, upon the grounds of error in the examination of the witness Eva Hollinger as above indicated, and upon the ground of the newly-discovered evidence of one Jacob Stone.    This motion was denied without reasons being filed, and exceptions were duly filed.    The questions discussed by counsel are fairly raised by the bill of exceptions.    Counsel for defendant say in their brief that the first question raised and involved on this appeal, is whether or not the court was in error in permitting the witness Eva Hollinger to answer certain questions as to her testimony on the preliminary examination, as indicated in the first assignment of error.

That the next and only other question involved is whether or not the court erred in denying a new trial on defendant's amended motion, which is covered by assignments of error 4 to 10.    (These all relate to the newly-discovered evidence of Jacob Stone.)

We are of opinion that counsel for defendant are right in claiming that error may be assigned upon the refusal of the court to grant a new trial upon the amended motion, request having been made that the court file its reasons in case of denial of motion.    See *Clark* v. *Telephone Co.*, 196 Mich. 168, 182.

1. Did the court err upon the trial in permitting the people's witness Eva Hollinger to be examined by the prosecutor, as to her testimony on the preliminary examination relating to the license number upon the car claimed to have been driven by defendant into the garage on the morning of July 17, 1919? It will be noted that this testimony was given upon re-examination, after a searching cross-examination assailing her testimony upon that subject. The people sought to corroborate her testimony.

Counsel for defendant quote the following from 40 Cyc. at page 2787:

"As a general rule a witness cannot be corroborated by proofs that on previous occasions he has made the same statements as those made in his testimony; and the rule is the same whether the previous statements were made verbally or in writing, and applies equally to statements under oath and unsworn statements."

Counsel fail to quote the remainder of the paragraph, which is as follows:

"Where, however, a witness has been assailed on the ground that his story is a recent fabrication, or that he has some motive for testifying falsely, proof that he gave a similar account of the transaction when the motive did not exist, before the effect of such account could be foreseen, or when motives of interest would have induced a different statement, is admissible; but in order to bring a case within this rule, it must appear that the conversation occurred soon after the transaction, is consistent with the statements made on oath, and contains such fact or facts pertinent to the issue involved as reasonably furnish to the jury some test of the witness' integrity and accuracy of recollection."

More than 50 cases from different States are cited in support of the latter proposition, including *Stewart v. People,* 23 Mich. 63 (9 Am. Rep. 78). We invite attention to the language of Mr. Justice COOLEY in

this case.   The headnote upon the subject is as follows:

"After an attempt to impeach a witness by showing that he has made out of court statements inconsistent with those sworn to in court, where the testimony is conflicting as to whether such statements were in fact made or not, his evidence may in some instances be supported by the written statements of the witness, put in writing at a time when it would be reasonably free from suspicion, and by the testimony of other witnesses as to statements made to them when under no temptation to misrepresent, corroborating his testimony in court.   The reasonable discretion which ought to be allowed circuit judges in such cases should not be disturbed, except in a clear case of abuse."

Approved in *Arnold* v. *Nye*, 23 Mich. 287, 295, and see *Meister* v. *People*, 31 Mich. 99.   See, also, *People* v. *Durfee*, 62 Mich. 487, 492; *Eherenkrook* v. *Webber*, 100 Mich. 314, 321; *Leach* v. *Railway*, 129 Mich. 286, 288; *Bernard* v. *Pittsburg Coal Co.*, 137 Mich. 279, 285.

Cases from other jurisdictions are cited, but we think that the instant case falls fairly within the reasonings of our own court in the cases cited.   There was no reversible error in the ruling admitting this testimony in corroboration in view of the wide scope of the cross-examination of the witness.

2. Did the trial court err in denying the motion for a new trial upon the ground of the so-called newly-discovered evidence of Jacob Stone?   A careful examination of Stone's affidavit in support of the motion will disclose that everything he states may be true, and yet the defendant be guilty of the crime of which he was convicted.   This evidence  was not newly-discovered.   The defendant had known, according to his own showing, of this evidence, and yet he went to trial without even asking for a continuance.   A new

trial will not be granted because of newly-discovered evidence where the witness who was to give it was known to the accused, although he could not be found at the time of the trial, where no continuance or postponement was requested. 16 C. J. p. 1193.

The case was pending from July, 1919, to January, 1921, and yet defendant simply states the conclusion in his affidavit "that he made all possible efforts to ascertain the whereabouts of Jacob Stone," without showing what he did. About a month after his conviction defendant discovered where Stone was.

The rule as to the proper practice is well stated in *Canfield* v. *City of Jackson*, 112 Mich. 120, and it has been reiterated a score of times since, as will appear by a reference to Shepard's Michigan Citations. We said in that case:

" 'A motion for a new trial upon the ground of newly-discovered evidence is not regarded with favor. The policy of the law is to require of parties, care, diligence and vigilance in securing and presenting evidence.' Elliott App. Proc. § 857. To entitle one to a new trial upon this ground it should be shown: *First,* that the evidence, and not merely its materiality, be newly discovered; *second,* that the evidence be not cumulative merely; *third,* that it be such as to render a different result probable on a retrial of the cause; *fourth,* that the party could not with reasonable diligence have discovered and produced it at the trial. Hayne, New Trial & App. §§ 88-92, and many cases there cited; *Gray* v. *Barton,* 62 Mich. 186."

The proposed evidence would be cumulative only to that of the defendant and other witnesses.

In our opinion it is not such as to render a different result probable on a retrial, in view of the character and weight of the people's evidence. There was no error in denying the motion for a new trial. At no time did defendant claim that the car found in his possession was other than the stolen car. He claimed,

however, to have had no guilty knowledge. There are many circumstances shown in the evidence tending to prove such knowledge. The repainting of a comparatively new car, the removal of the license plates and the bumpers, the change in the motor number, the manner in which the car was handled in the garage, the mystery surrounding the man Derondo, and his place of residence, and the conduct of defendant when arrested—these and many other circumstances tended strongly to show defendant's guilt.

We find no reversible error in the case and the judgment below is affirmed.

STEERE, C. J., and WIEST, CLARK, BIRD, and SHARPE, JJ., concurred. MOORE and FELLOWS, JJ., did not sit.