# Court of Appeals, State of Michigan

## ORDER

People of MI v Lorinda Irene Swain

Docket No. 314564

LC No. 2001-004547-FC

Cynthia Diane Stephens
Presiding Judge

Joel P. Hoekstra

Patrick M. Meter
Judges

---

The Court orders that the December 11, 2014 opinion is hereby VACATED, and a new opinion is attached.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

FEB 05 2015

Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

LORINDA IRENE SWAIN,

        Defendant-Appellee.

UNPUBLISHED
February 5, 2015

No. 314564
Calhoun Circuit Court
LC No. 2001-004547-FC

Before: STEPHENS, P.J., and HOEKSTRA and METER, JJ.

PER CURIAM.

In 2002, following a jury trial, defendant was convicted of four counts of first-degree criminal sexual conduct, MCL 750.520b(1)(a), related to her sexual abuse of her adopted son, Ronnie Swain. This Court affirmed defendant's convictions on direct appeal in 2004. Defendant has since filed several motions for relief from judgment. Most recently, after this Court reversed the trial court's grant of one of defendant's successive motions, *People v Swain*, 288 Mich App 609; 794 NW2d 92 (2010), the trial court permitted defendant to supplement that motion and conducted an evidentiary hearing. The trial court then granted defendant's successive motion for relief from judgment based on findings of newly discovered evidence involving a *Brady*[1] violation, the interests of justice under MCL 770.1, and defendant's actual innocence. The prosecution now appeals by leave granted. We reverse.

This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for relief from judgment. *Swain*, 288 Mich App at 628. An abuse of discretion occurs when a decision falls outside the range of reasonable and principled outcomes or when the trial court makes an error of law. *Id*. at 628-629. A trial court's factual findings related to a motion for relief from judgment are reviewed for clear error. *Id*. at 628; MCR 2.613(C). Due process claims, such as those involving allegations of a *Brady* violation, are reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

---

[1] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Motions for relief from judgment are governed by MCR 6.501 *et seq*. *Swain*, 288 Mich App at 629. Under these provisions, a defendant bears the burden of establishing entitlement to the requested relief. MCR 6.508(D). Pursuant to MCR 6.502(G)(1), a defendant is generally entitled to only one such motion in regard to a conviction. Attempts to file successive motions are governed by MCR 6.502(G), which prohibits a successive motion unless the motion is based on either (1) "a retroactive change in law that occurred after the first motion for relief from judgment" or (2) "a claim of new evidence that was not discovered before the first such motion." See MCR 6.502(G)(2). These are the only two exceptions to the general prohibition on successive motions for relief from judgment. *Swain*, 288 Mich App at 635-636. If a defendant fails to satisfy at least one of these exceptions, a trial court abuses its discretion by failing to deny the motion. See *id*.

Defendant alleges that she has presented the trial court with "new evidence" that was not discovered before her previous motion for relief from judgment, thereby satisfying the newly-discovered-evidence exception in MCR 6.502(G)(2). To determine whether evidence is newly discovered, we apply the test articulated in *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), which requires a defendant to establish that:

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [Internal citations and quotation marks omitted.]

To resolve the present dispute, it is initially necessary to identify what constitutes the "newly discovered evidence" at issue. The prosecution maintains that the allegedly newly discovered evidence is the identity of Dennis Book, defendant's former live-in boyfriend, and his knowledge of events in the trailer where some of the abuse occurred. If such a formulation of the "evidence" is accepted, plainly defendant has not shown entitlement to relief on the basis of newly discovered evidence. This is so because it is well-accepted in Michigan that evidence is not newly discovered if, as in the present case, the defendant or defense counsel was aware of the evidence at the time of trial. *People v Rao*, 491 Mich 271, 281; 815 NW2d 105 (2012). In defendant's case, it is uncontested that, at the time of trial, defendant and her trial counsel (Edwin Hettinger) both knew of Book's presence in the trailer during a portion of the relevant period, and they knew that he would be aware that abuse had not occurred in his presence. Defendant in fact referenced Book in her trial testimony, describing his presence in the home during part of the relevant time, and Hettinger acknowledged at the evidentiary hearing that he had been informed of Book's presence in the home. Under these circumstances, defendant and her attorney were most certainly aware at all pertinent times of Book's ability to provide testimony concurring the abuse or lack thereof and defendant has thus failed to show that the evidence was newly discovered. See *People v Terrell*, 289 Mich App 553, 570; 797 NW2d 684 (2010).

Moreover, as a related matter, the third consideration of *Cress* requires that defendant demonstrate "reasonable diligence" in her effort to have discovered and produced the evidence at trial. *Cress*, 468 Mich at 692. While defendant has indicated that, despite her knowledge of Book, she could not call him as a witness because of his perceived hostility toward her and his

unwillingness to speak with her, "a defendant's awareness of the evidence at the time of trial precludes a finding that the evidence is newly discovered, even if the evidence is claimed to have been 'unavailable' at the time of trial." *Rao*, 491 Mich at 282. In these circumstances, a defendant "is charged with the burden of using *reasonable diligence* to make that evidence available and produce it at trial." *Id*. at 283 (emphasis in original). What constitutes reasonable diligence will depend on the circumstances involved, bearing in mind that "the law affords a defendant procedural avenues to secure and produce evidence and, under *Cress,* a defendant must employ these avenues in a timely manner because evidence that is known to the defendant, yet not produced until after trial, will not be considered grounds for a new trial." *Id*. at 283-284.

Applying these principles in this case, defendant plainly failed to exercise the required reasonable diligence by not availing herself of the opportunity to subpoena Book to testify under the penalties of perjury despite the fact that she knew he had information regarding the abuse. See *United States v Turns*, 198 F3d 584, 588 (CA 6, 2000). Book in fact acknowledged at the evidentiary hearing that, despite his hostility toward defendant, he would have testified favorably to defendant if subpoenaed. Such a statement clearly demonstrates that if defendant had exercised reasonable diligence, the evidence would have been presented at trial, thus further belying any claim that Book's testimony was newly discovered within the meaning of *Cress*. That defendant ultimately opted, as a strategic decision, not to call Book because of his hostility toward her does not render his information newly discovered. See *People v Newhouse*, 104 Mich App 380, 386; 304 NW2d 590 (1981).

On appeal, in an effort to establish that the testimony she now wishes to present is newly discovered, defendant has attempted to frame the "evidence" as the fact that, unbeknownst to defendant, Book would have been a "favorable defense witness." The trial court accepted defendant's framing of the issue, explaining that the new evidence consisted of the fact that

> Book told [Detective Guy] Picketts before the trial of this case information based on first-hand knowledge that the Defendant did not commit the crimes with which she was charged and ultimately convicted. Put another way, the evidence at issue is that Book was, at the time of the trial, a favorable defense witness. Picketts knew it, the Defendant did not.

We find this characterization of the "evidence" at issue unpersuasive and ultimately unhelpful to defendant's effort to establish entitlement to relief from judgment.

Indeed, accepting the trial court's factual conclusion that the conversation with Detective Picketts occurred and that it was not made known to defendant until 2011, to the extent the conversation itself can arguably be considered the specific "evidence" at issue, its discovery would not entitle defendant to a new trial under *Cress*. This is so because the fact that a conversation occurred between Detective Picketts and Book is, in itself, of no relevance to any issue at trial and cannot be seen as making a different result probable on retrial. *Cress*, 468 Mich at 692. That is, the fact that Book spoke to Detective Picketts on the telephone does not tend to make it more or less probable that defendant abused the victim or that the victim fabricated the allegations. MRE 401. What would be relevant is the substance of the conversation, i.e. Book's claim that he did not witness any abuse. However, his remarks in this regard during the telephone conversation constitute out-of-court statements which, if offered for the truth of the

matter asserted, would constitute hearsay. MRE 801(c). As defendant concedes on appeal, given that the statements to Detective Picketts constitute hearsay, they would not be admissible. MRE 802. Thus, by itself, the conversation would not make a different result probable on retrial. Instead, the only way the conversation with Detective Picketts can be remotely conceived as providing evidence that could potentially affect the outcome of the trial would be if the "evidence" is Book's personal knowledge of events in the trailer.[2] However, because, as discussed, defendant already knew of Book's potential testimony, she cannot claim that the information is newly discovered by virtue of learning about Book's conversation with Detective Picketts. As this Court has previously recognized, "[o]ne does not 'discover' evidence after trial that one was aware of prior to trial. To hold otherwise stretches the meaning of the word 'discover' beyond its common understanding." *Terrell*, 289 Mich App at 568 (internal citation and quotation marks omitted; emphasis removed). In short, when defendant heard about Book's conversation with Detective Picketts, she learned nothing new that could potentially affect the outcome of the trial and, consequently, she has not shown the existence of newly discovered evidence entitling her to relief under *Cress*.

To the extent defendant and the trial court have more generally characterized the evidence as Book's status at the time of trial as a "favorable defense witness," Book's characterization as such is at odds that his undisputed hostility toward defendant at the time of trial. Further, to the extent that, despite his hostility, Book can be characterized as "favorable" because he possessed potentially favorable information, his status as a "favorable" witness was not newly discovered because defendant knew all along that he possessed this information. Moreover, his status as a "favorable defense witness" is also not "evidence" and thus not a basis for a new trial under *Cress*. In this regard, both MCR 6.502(G)(2) and *Cress* reference newly discovered "evidence." As most basically defined, "evidence" is "[s]omething (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact. . . ." *Black's Law Dictionary* (9th ed); see also MRE 401. The alleged facts in defendant's case related to allegations of sexual abuse, and material to such determination was, of course, the credibility of those involved. See *People v Grissom*, 492 Mich 296, 321 n 41; 821

---

[2] Although we view the first and third factors as the most obvious indications that defendant has failed to satisfy the standards discussed in *Cress*, Book's testimony to the effect that he had not witnessed abuse while living in the trailer would also have been cumulative of similar testimony offered at trial by another of defendant's former boyfriends who also lived in the trailer during part of the relevant time. The victim's brother—who also lived in the trailer—similarly stated that he had not personally witnessed abuse. Defendant also testified and denied that abuse occurred. There were thus several witnesses who lived in the trailer to testify that they had not seen abuse in the home. Given that Book's testimony would have been evidence of "the same kind to the same point," it strikes us as plainly cumulative. See *People v Grissom*, 492 Mich 296, 320 n 41; 821 NW2d 50 (2012) (internal citation and quotation marks omitted). Given the cumulative nature of Book's evidence, it cannot be seen as creating a reasonable probability of a different outcome at retrial. See *People v Carbin*, 463 Mich 590, 603; 623 NW2d 884 (2001); *People v Purman*, 216 Mich 430, 439; 185 NW 725 (1921).

NW2d 50 (2012). It follows that what is "evidence" in this case is not Book's abstract favorability to one side or the other, or his usefulness to defendant as a strategic matter, but his knowledge of events and the people involved. In other words, Book's perceived status as a "favorable defense witness" is, quite simply, not evidence. See *Turns*, 198 F3d at 588 (recognizing that "evidence" was not whether a witness would testify truthfully but what information the witness had about the material facts of consequence at trial).

In sum, we are persuaded that the "evidence" at issue consisted of Book's personal knowledge of events at the trailer and his observation of defendant's behavior with her sons. Because this evidence was plainly known to defendant, she cannot now argue that it was newly discovered. See *Rao*, 491 Mich at 281. Given that defendant has not shown that the evidence was newly discovered, and that she has not argued there was a retroactive change in the law, her successive motion for relief from judgment was barred by MCR 6.502(G) and the trial court abused its discretion in granting her motion. See *Swain*, 288 Mich App at 635-636.

In contrast to this conclusion, defendant maintains that she is not required to establish that the evidence in question was newly discovered within the meaning of *Cress* because her underlying claim involves a *Brady* violation. Defendant has not provided this Court, however, with any authority for the proposition that the standards for evaluating whether evidence is newly discovered for purposes of MCR 6.502(G)(2) are inapplicable in cases involving constitutional claims, nor are we aware of any such authority. Nevertheless, if we were to assess whether a *Brady* violation occurred without first determining if defendant had presented newly discovered evidence within the meaning of *Cress*, defendant would still have failed to satisfy her burden.

Under *Brady,* due process requires the state to disclose evidence in its possession to the defendant, provided that the evidence is favorable to the defense and material to the defendant's guilt or punishment. *Smith v Cain*, ___ US ___; 132 S Ct 627, 630; 181 L Ed 2d 571 (2012); *Schumacher*, 276 Mich App at 176. However, evidence that is known to a defendant cannot form the basis of a *Brady* violation. See *Apanovitch v Houk*, 466 F3d 460, 474 (CA 6, 2006) (recognizing that *Brady* "only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial"). See also *Henness v Bagley*, 644 F3d 308, 325 (CA 6, 2011).

Defendant readily concedes that she had firsthand knowledge of Book's presence in the trailer and thus whether she abused the victim in his presence. At trial, she referenced Book's presence in the trailer, asserting that he was present in the mornings, including during times when she dressed the victim. Her trial counsel similarly conceded at the evidentiary hearing that, before trial, defendant informed him of Book's presence in the home. Given defendant's firsthand knowledge of Book's presence in the trailer, she had available to her all the essential facts permitting her to take advantage of any exculpatory information Book could have provided. Defendant's failure to avail herself of Book's evidence by not calling him as a witness at trial, despite the fact that she knew he had not witnessed any abuse, does not establish the existence of a *Brady* violation.

Moreover, to the extent defendant has insisted that Book's evidence, while known to her, was unavailable because of Book's hostility toward her, this complaint also fails to establish a *Brady* violation. Book's reluctance to assist defendant at the time of trial, while perhaps

unfortunate for defendant, does not demonstrate that she was ignorant of the information he possessed or that the *state* somehow interfered with her access to this information. See *Benge v Johnson*, 474 F3d 236, 244 (CA 6, 2007) (finding that a witness's refusal to assist the defendant was not the prosecution's doing and thus no *Brady* violation had occurred). Ultimately, defendant knew the essential facts of Book's potential testimony and, consequently, she has not shown a *Brady* violation.

Defendant again protests the framing of what constitutes the "evidence" at issue, maintaining that the focus should be on the telephone conversation, not Book's actual knowledge of events in the trailer. This view of the evidence does not, however, establish a *Brady* violation. As discussed *supra*, the telephone conversation consisted of inadmissible hearsay, MRE 801(c); MRE 802, a fact which defendant has conceded on appeal. Because the telephone conversation was not admissible, defendant could not have made use of it at trial.

Defendant argues, however, that the disclosure of the telephone conversation could have led to the discovery of additional information, i.e., evidence regarding Book's personal knowledge of events in the trailer, that would have been admissible and that would have resulted in a different outcome at trial. In this regard, defendant is correct that, where the undisclosed information is inadmissible, a *Brady* violation may potentially still exist provided that the defendant can demonstrate that the information "would lead to the discovery of additional, admissible evidence that could have resulted in a different result at trial." *Henness*, 644 F3d at 325. However, even if Book had been inclined to be helpful, defendant would not have obtained "additional" information because the only information that the telephone conversation might have led to was information already known to defendant, information which she chose not to avail herself of when she decided not to call Book to the stand.[3] As discussed, information that is known to a defendant does not form the basis for a *Brady* claim. Overall, defendant has not established the existence of a *Brady* violation. Because she has also failed to establish the existence of newly discovered evidence, her successive motion for relief from judgment was barred by MCR 6.502(G) and the trial court abused its discretion in granting her motion. *Swain*, 288 Mich App at 635-636.

The trial court also granted defendant's request for relief under MCL 770.1, which allows a trial court to grant a new trial "for any cause for which by law a new trial may be granted, or

---

[3] Defendant has also suggested on appeal that things could have been different because she would have undoubtedly subpoenaed Book, regardless of his hatred of her, if she had known of the telephone conversation. This is not factually consistent, however, with Hettinger's testimony at the evidentiary hearing that, even if he had known of the telephone conversation, any decision to call Book would have involved consideration of Book's hostility toward defendant. Given Book's open and unchanged hostility toward defendant, and recognizing that it was this concern for Book's hostility that motivated the decision not to subpoena Book despite the fact that he was known to possess favorable information, we cannot see that knowledge of the telephone conversation would have been reasonably likely to affect the strategic decision not to call Book.

when it appears to the court that justice has not been done, and on the terms or conditions as the court directs." In relying on this statutory provision, however, the trial court ignored the fact that, in defendant's case, the time for filing motions for a new trial under MCL 770.1 had long since passed. See MCL 770.2(1). Because of this fact, defendant is now limited to the relief available through MCR 6.500 *et seq*. See, generally, *People v Kincade*, 206 Mich App 477, 482; 522 NW2d 880 (1994). However, because defendant has not satisfied MCR 6.502(G)(2), she is not entitled to relief. We note that defendant has not shown "good cause" for the delay in filing her motion as required by MCL 770.2(4). On the contrary, some of the information on which the trial court based the need for a new trial under MCL 770.1—the information from Book—has been known to defendant since the time of trial.[4] If such evidence constituted "good cause" for relief, defendant should have raised it at trial or in a timely motion for a new trial. See *People ex rel Coon v Plymouth Plank Rd Co*, 32 Mich 248, 249 (1875). Nor can we say that "justice has not been done" in defendant's case. The trial court's reliance on MCL 770.1 to grant defendant relief was an abuse of discretion.

The trial court also granted defendant's motion based on her freestanding claim of actual innocence under the federal constitution within the meaning of *Herrera v Collins*, 506 US 390; 113 S Ct 853; 122 L Ed 2d 203 (1993). In *Herrera*, in the context of federal habeas review, and although not going so far as to conclusively recognize that a cognizable actual innocence claim exists under the federal constitution, the Court stated: "We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id*. at 417. More recently, the Supreme Court has reaffirmed that no standalone actual innocence claim has yet been recognized, explaining: "We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v Perkins*, ___ US ___; 133 S Ct 1924, 1931; 185 L Ed 2d 1019 (2013). In other words, contrary to defendant's arguments, it is not certain from the authorities on which she relies that there exists a freestanding claim of actual innocence. Moreover, if such a right exists, it seems questionable whether it would apply to defendant's case because her case is not, in contrast to *Herrera*, a capital case. See *Wright v Stegall*, 247 Fed App'x 709, 711 (CA 6, 2007). Further, *Herrera* also suggested that, when available, the appropriate avenue for relief on actual innocence grounds rests in an application for executive clemency. *Herrera*, 506 US at 414-417. Because such avenues are available in Michigan, see Const 1963, art 5; § 14; MCL 791.243, it is not clear that the type of actual innocence claim contemplated in *Herrera* would be properly brought before the courts. All these things considered, we cannot say that defendant has shown the existence or applicability of a federal freestanding actual innocence claim in this case.

---

[4] The trial court also discussed the testimony of Tanya Winterburn and William Risk. As discussed *infra*, the evidence from these witnesses was not all that helpful to the defense, and this Court has previously held that it did not warrant a new trial. *Swain*, 288 Mich App at 640.

At any rate, assuming that such a right exists and that it would be applicable to defendant, we are not persuaded that defendant has satisfied the high standard that would be required to merit relief. *Herrera* itself declined to precisely identify what standard would apply to the evaluation of such a claim, explaining only that it "would necessarily be extraordinarily high." See *Herrera*, 506 US at 417. In *Swain*, 288 Mich App at 638, this Court described the standard as requiring a defendant to demonstrate that it is more likely than not that no reasonable juror would have found the defendant guilty.

The victim testified to the particulars of the abuse and what occurred, explaining that defendant performed oral sex on him on numerous occasions, both at the trailer and at the house on Oak Grove. As the victim of sexual assault, it was not necessary that his testimony be corroborated, MCL 750.520h, and, if believed, the victim's testimony alone would be enough to allow the jury to convict defendant. Nevertheless, there was corroboration for circumstantial details in the victim's version of events. For example, defendant herself acknowledged the sleeping arrangements at her parents' house, agreeing that she slept in a bed with the victim as he had indicated at trial. She also admitted that she helped him dress in the mornings. Consistent with the victim's testimony, the victim's brother testified that he waited outside for the bus alone on a few occasions and that defendant treated him differently than the victim, affording the

victim special privileges and kissing the victim on the lips. Lending further credibility to the victim's version of events, the prosecution's expert opined that the victim manifested behaviors that were consistent with that of a child sexual abuse victim. Reviewing this same information during a previous appeal in regard to defendant's claimed actual innocence, we explained:

> Dr. Randall Haugen, an expert regarding the sexual abuse of children and a counselor of the victim, testified that the victim manifested behavior, such as sexually reactive behavior toward other children, compulsive masturbation, and a hoarding of women's underwear, that was consistent with a child who had been sexually abused. Haugen also testified that the discovery of a child's sexually inappropriate behavior can lead to a disclosure by the child of prior sexual abuse, and Haugen noted that the victim disclosed the abuse when he was confronted by his stepmother concerning his actions toward a young cousin. [*Swain*, 288 Mich App at 641-642.]

In addition to the evidence supporting the victim's version of events, there was evidence that cast doubt on defendant's credibility. Defendant made what would be viewed by a reasonable juror as incriminating statements during her interview with Detective Picketts. Most notably, without being informed of the precise nature of the allegations, defendant yelled: "I never sucked my kid's dick." The statement would suggest to a reasonable juror that defendant knew of the nature of the allegations without being told because she had in fact performed the acts which she so vehemently denied. Defendant also answered questions inconsistently during her conversations with Detective Picketts, first claiming that she had not dressed the victim and then acknowledging that she continued to dress him when he was as old as eight or nine years of age. Further, defendant stated to Detective Picketts that the victim was "special" to her and that she had a closer relationship with the victim than with his brother. These remarks tended to corroborate the disparate treatment described by both the victim and the brother, and it coincided with the expert testimony of Dr. Haugen, who indicated that sexual abusers often foster a special

relationship with their victims, grooming them through the use of gifts or the provision of special privileges.[5]

In contrast to this evidence supporting defendant's guilt, defendant notes that there are three witnesses who did not testify at trial whose testimony could now be used to discredit the victim. Certainly, given that William Risk and Tanya Winterburn could testify that the brother did not wait outside for the bus alone, it could potentially cast doubt on the credibility of the victim and the brother. However, by equal measure, the inconsistency could also have been resolved in favor of the victim's and the brother's testimony. For example, Winterburn and Risk both acknowledged in their testimony that, for various reasons, there were times when they could not be aware of whether the brother was outside alone. Moreover, at one of the evidentiary hearings, the prosecution produced a neighbor who testified that the brother did wait outside alone on multiple occasions, a fact which caught her attention because the boys were so often together. Her testimony could be presented in support of the testimony of the victim and his brother. At trial, defendant indicated that the boys typically waited *inside* the trailer for the bus to arrive, meaning defendant's own testimony would have been somewhat inconsistent with Risk and Winterburn's evidence. On the whole, the ancillary question of whether the brother waited outside alone, or how often he waited outside alone, is a credibility question, and it is a question a reasonable juror could easily resolve in favor of the testimony provided by the victim and his brother at trial.

Similarly, while Book testified that he did not see any abuse in the trailer, by his own admission he was not in the house at all times and he lived with defendant for only *part* of the time in which the abuse was alleged to have occurred. In other words, Book's testimony, even if believed, is not proof that abuse did not occur. Instead, the jury could reasonably believe the victim in this regard, and would have been particularly likely to do so in light of the expert testimony on child sexual abuse, defendant's incriminating statements to Detective Picketts, and her confession to Charles. Defendant also emphasizes that the victim and his brother have recanted their testimony since trial, casting further doubt on her guilt. Undoubtedly, the fact that they have recanted would have created an important issue of credibility for the jury. However, the mere fact that they have recanted does not erase the evidentiary value of their trial testimony. On the contrary, recantation testimony is traditionally regarded as "suspect and untrustworthy." *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). Further, the skepticism with which such recantations are viewed is "only heightened when the recanting witness is a family member and the witness may have feelings of guilt or may be influenced by family members seeking to change the witness's story." *United States v Coker*, 23 Fed App'x 411, 412 (CA 6, 2001). On the whole, the evidence is such that defendant has not established "actual innocence."

---

[5] Added to this evidence is the testimony of an inmate, Deborah Charles, who described defendant confessing to her in prison. Consistent with the victim's allegations, defendant admitted to Charles that she had slept naked with the victim and that she had sexually abused the victim while using drugs. She also told Charles that she found the victim more attractive than his brother and, for this reason, she kissed the victim on the lips and the brother on the cheek.

Even assuming there exists a cognizable freestanding actual innocence claim, the trial court abused its discretion in granting relief on this basis.

Reversed.

/s/ Joel P. Hoekstra
/s/ Patrick M. Meter